**[J-98-2012]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 638 CAP |
| | : |
| Appellee | : Appeal from the Order entered on 8/31/11 |
| | : in the Court of Common Pleas of |
| | : Lancaster County, Criminal Division at No. |
| v. | : CP-36-CR-0002324-2000 |
| | : |
| | : |
| TEDOR DAVIDO, | : |
| | : |
| Appellant | : SUBMITTED:  August  3, 2012 |

**OPINION**

**PER CURIAM**                                          **DECIDED:  December 15, 2014**

In this capital case, Tedor Davido appeals from the order of the Court of Common Pleas of Lancaster County denying his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546.  We affirm.

**I. Background**

We set forth the facts of this case in our Opinion affirming Appellant's sentence of death.  Commonwealth v. Davido, 868 A.2d 431 (Pa. 2005).  The following is a summary of the facts pertinent to the issues raised on collateral review.  Prior to 2000, Appellant served a sentence in Ohio for aggravated assault against a former girlfriend whom he had accused of having sexual relations with one of his brothers.  In late April 2000, Appellant's new girlfriend, Angelina Taylor, and her two-year-old son moved from Ohio to live with Appellant at 26 Hager Street in Lancaster.  Appellant's mother, sisters,

brothers, and the girlfriend and children of Appellant's brother, Spanky Davido, also resided there. On Sunday morning, May 14, 2000, an argument arose between Appellant and Ms. Taylor deriving from his suspicion that she had engaged in oral sex with Spanky Davido.

The dispute became violent, and Appellant began beating and loudly berating Ms. Taylor, calling her a "whore" and a "bitch" that "sucks d**k." N.T. Trial, 12/5/01, at 59. Ms. Taylor begged Appellant to stop hitting her and asked Appellant's sister for help. When Appellant's sister told Appellant to stop beating Ms. Taylor, Appellant cursed at her and ordered her to leave. Ultimately, all of Appellant's relatives left the residence, taking Ms. Taylor's son with them, leaving only Appellant and Ms. Taylor inside. At 7:52 a.m., shortly after leaving the residence, Appellant's sister called 911 from a pay phone several blocks away. After identifying herself as a neighbor, she reported that a man was beating a woman at 26 Hager Street.

Two police officers were immediately dispatched to investigate a "domestic situation" that involved a "man … hitting a woman[,]" and were informed en route that loud screaming had been heard from inside the residence. Id. at 80. The officers arrived at the residence shortly before 8:00 a.m., but all was quiet. They knocked at the front and back doors, but no one answered. They opened an unsecured window in the front of the house, announced themselves and listened for any response, but heard nothing. The officers radioed police dispatch for information regarding the 911 caller or for the phone number within the residence. The officers were told by dispatch that the 911 call had come from a pay phone and that no phone number was listed for the address. The officers heard a phone ringing inside but the call was not answered. Responding to a "gut feeling" that someone inside might be injured or otherwise in need of assistance, one officer entered the residence through an unsecured window,

unlocked a deadbolt on the front door, and admitted the other officer. N.T. Trial, 12/5/01, at 84. The officers continued to announce themselves and their reason for being there, and proceeded to conduct a floor-to-floor, room-to-room search for any injured person who might have been in need of assistance.

Appellant, who had been inside the house, heard the officers enter, and fled through a third-story window, wearing only a pair of sweatpants and socks. He ran along a rooftop, jumped onto a car parked in an adjacent alley, and then ran to the home of Michele Gray. He informed Ms. Gray that he had beaten Ms. Taylor, and that he had fled when he had heard the police in the house. He also told her that at the time he fled, Ms. Taylor had been pale, motionless, unresponsive, and having trouble breathing.

Meanwhile, the officers made their way to the rear bedroom on the third floor, where they discovered a woman, later identified as Angelina Taylor, naked under a sheet on a mattress on the floor. Ms. Taylor was seriously injured, with numerous bruises and cuts visible on her face and body, including her pelvic region, as well as severe bruising on both sides of her throat and around both eyes. Her eyes were open but she was completely unresponsive and having difficulty breathing. The officers called for emergency response personnel, who took the victim to the hospital. The police then secured the scene and obtained a search warrant for the residence.

At the hospital, the victim (initially identified as Jane Doe) was placed on life-support after being diagnosed as comatose due to bleeding in the brain. In the trauma unit, a rape-kit examination was conducted, which revealed numerous lacerations, bruises and abrasions inside and outside the victim's vagina. A large quantity of motile sperm was removed from inside her vagina as well. The victim never regained consciousness and her brainstem herniated from the swelling inside her head. The

victim was pronounced brain-dead at 4:55 p.m. on May 14, 2000, and was removed from life-support the next day, after her identity had been established and her parents, who had been contacted in Ohio, arrived at the hospital and gave their consent to end life-support.

After he left Michele Gray's house, Appellant fled to Harrisburg and stayed overnight at a motel under an assumed name. He returned to Lancaster the next day where, pursuant to a warrant, he was arrested on charges of murder and rape.[1] After informing Appellant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), the police questioned Appellant, who gave conflicting accounts of what had occurred. At first, Appellant denied strangling the victim, but he later admitted that he had choked her with his hands, while denying that he used a cord or other ligature device. He theorized that the bruising on the victim's neck could have come from her shirt, because he had pulled on it. He admitted slapping the victim but denied hitting her with a closed fist. When asked about the bruises on her body and face, he stated that the victim had fallen down the stairs from the second floor to the first floor and had landed on her face. He later explained that he and the victim had been standing near the top of the steps and that she had grabbed his shirt. He further stated that he then turned around and grabbed at her, and "she flew over my head like a dream" and tumbled down the steps face-first. N.T. Suppression Hearing, 3/28/01, at 55; N.T. Trial, 12/10/01, at 677.

Appellant also explained that the bruises to the victim's pelvic area had been caused earlier during the weekend when he had thrown a football at her and had accidentally hit her in the groin. He theorized that the sperm inside the victim had been

---

[1] Shortly after the victim had been removed from the residence, other family members returned to the home and told police that Appellant and the victim had been fighting. The police obtained an arrest warrant for Appellant on a charge of aggravated assault, which was amended the following day to reflect charges of murder and rape.

deposited the evening before, when she had engaged in consensual sex with him in the bathroom of a movie theater. He told police that the victim had been hoping to become pregnant, and so, after the sexual encounter in the theater bathroom, she had kept her legs up in the air for some time to aid the impregnation process. He also related that they had engaged in consensual sex twice more the prior evening, once in the car, and once in the bedroom, before the fight started.

Appellant stated that after Ms. Taylor tumbled down the stairs, she had become unable to move, so he carried her to the second floor. He stated that when he later heard the police enter, he carried her to the back bedroom on the third floor, and then fled the residence because he was scared. At that point during the questioning, Appellant asked the detective whether the police were "allowed to just walk in like that," and the detective answered that "with [Ms. Taylor] being hurt like she was," and having received a call that a woman was being beaten, "they [the officers] could check to make sure everything was okay." N.T. Trial, 12/10/01, at 673-74. Appellant later filed an unsuccessful motion to suppress his statements to police on the basis that they had not been knowing and voluntary. Appellant did not seek suppression of any evidence on the basis that it had been seized during, or as the derivative result of, an illegal entry and search of the residence by the police.

At trial, forensic pathologist Dr. Wayne Ross, who had performed the autopsy on Ms. Taylor's body, testified that the manner of death was homicide and that the cause of death was multiple blunt force traumatic injuries to the head. He testified that the blunt force trauma or "massive repeated impacts" to the head were delivered with "a tremendous amount of force … in excess of hundreds of G's of force" that caused "twisters" and "shearing injury, going directly to the center of the brain," resulting in bleeding and massive swelling of the brain that eventually crushed the brain stem and

killed the victim. Id., 12/7/01, at 450-52. Appellant objected to Dr. Ross's testimony regarding shearing injury and G-forces on the basis that it was beyond the scope of Dr. Ross's expert report and the Commonwealth's proffer. The trial court overruled the objection because the challenged testimony was "directly relate[d] to brain injuries." Id. at 453.

Based on the injuries seen post-mortem, Dr. Ross testified within a reasonable degree of medical certainty that Ms. Taylor had suffered both manual and ligature strangulation of several minutes' duration and that she had been the victim of "forced penetration or rape." Id. at 460. Registered nurse Maureen McGarrity, a sexual assault forensic examiner who performed the rape-kit examination on Ms. Taylor in the trauma unit, testified that during the vaginal speculum exam she conducted, in addition to collecting a large amount of motile sperm, she saw multiple lacerations to the vaginal wall and multiple labial abrasions.

The Commonwealth also presented the testimony of Matt Kauffman, who had been an inmate housed with Appellant in the Medical Housing Unit of Lancaster County Prison following Appellant's arrest on the instant charges. Mr. Kauffman testified that Appellant "explained what had happened" as follows:

> [H]e had c[o]me home and they were fighting and one thing led to the next and he started hitting her. He threw her down the steps and drug her back up [by the hair] and was like, banging her head in the side of a dresser. And he was kicking her and like, stomped on her back.

Id. at 505-06.

Mr. Kauffman further related that Appellant told him that the victim had become unresponsive following the beating and that Appellant had then "had sex" with her. Id. at 506. During cross-examination, Mr. Kauffman admitted that he had been "in the

Medical Housing Unit because of medication and because of issues arising out of depression[.]" Id. at 512. Additionally, Anthony Brown, another inmate in the Medical Housing Unit of the Prison, testified that Appellant had told him that "he hit [the victim], that she fell down the steps[,] that she struck her head on something, … [he] dragged her back into the bedroom … [and] he f\*\*ked her." Id. at 565.

Appellant instructed his defense counsel that he would not agree to the presentation of any defense that conceded the intent to kill. He testified in his own defense and adamantly maintained that the victim's death had been accidental and unintentional. Accordingly, the defense strategy to the charge of first-degree murder was to present facts which might support an inference that Appellant had lacked the specific intent to kill and to secure a guilty verdict to a lesser degree of homicide.[2] The jury found Appellant guilty of first-degree murder and rape.

Appellant advised his attorneys and the court that he wished to represent himself during the penalty-phase proceedings. Moreover, he informed the court that he did not wish to present any evidence of mitigating circumstances. The court conducted a colloquy to determine whether Appellant's choices were knowing, intelligent and voluntary. Defense counsel made an oral motion for a mental health evaluation and a determination of competency. The court denied the motion and permitted Appellant to represent himself during the penalty-phase proceedings. Appellant presented no mitigating evidence and the jury, which found a single aggravating circumstance (that Appellant committed the killing while in perpetration of a felony, 42 Pa.C.S. §9711(d)(6)), returned a sentence of death.

---

[2] Despite Appellant's desire not to pursue any defense based upon an intentional killing, he ultimately requested a jury instruction on voluntary manslaughter, which the court provided.

On direct appeal from the judgment of sentence, Appellant raised a challenge to the trial court's decision to permit him to waive the presentation of mitigating evidence and to proceed pro se during the penalty phase of the trial. This Court noted that, pursuant to the Sixth Amendment to the U.S. Constitution, a criminal defendant has the right to dispense with counsel altogether and to represent himself during the penalty phase of a capital case. Davido, 868 A.2d at 444. Moreover, we determined that Appellant had knowingly, intelligently, and voluntarily waived his right to counsel during the penalty phase, as well as his right to present evidence of mitigating circumstances. Id.

Appellant also challenged the trial testimony of Dr. Ross on direct appeal. Appellant alleged that Dr. Ross's conclusions regarding the cause of death, particularly those conclusions based upon his testimony regarding G forces, were speculative and not presented within a reasonable degree of medical certainty. We determined that the issue was without merit and held that Dr. Ross's testimony established the cause of death to a reasonable degree of medical certainty, and that his testimony regarding the cause of death was not speculative. Id. at 441-42.

Appellant filed a petition for a writ of certiorari, which was denied. See Davido v. Pennsylvania, 546 U.S. 1020 (2005). Appellant then filed a pro se PCRA petition, and an amended petition was subsequently filed on Appellant's behalf by the Federal Community Defender Office ("FCDO") for the Eastern District of Pennsylvania, raising fifteen issues. An evidentiary hearing was held over the course of five days, during which sixteen witnesses testified, including a number of expert witnesses, and dozens of evidentiary exhibits were introduced. A full day of oral argument was later heard, and the parties also briefed the issues for the court's consideration. The PCRA judge, who

had also presided at trial, denied the petition, and Appellant appealed to this Court. Appellant now raises twelve issues for our review.

Under the applicable standard of review, we must determine whether the rulings of the PCRA court are supported by the record and are free of legal error. Commonwealth v. Spotz, 47 A.3d 63, 75 (Pa. 2012) (citing Commonwealth v. Hutchinson, 25 A.3d 277, 284-85 (Pa. 2011)). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. Id.

To prevail on a petition for PCRA relief, a petitioner must plead and prove, by a preponderance of the evidence, that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a constitutional violation or ineffectiveness of counsel which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2); Spotz, 47 A.3d at 76.

With respect to claims of ineffective assistance of counsel, we begin with the presumption that counsel is effective. To prevail on an ineffectiveness claim, a petitioner must satisfy, by a preponderance of the evidence, the Sixth Amendment performance and prejudice standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). This Court has divided the performance component of Strickland into two sub-

parts dealing with arguable merit and reasonable strategy. Commonwealth v. Baumhammers, 92 A.3d 708, 719 (Pa. 2014). Thus, to prevail on an ineffectiveness claim, Appellant must show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his or her action or omission; and Appellant suffered prejudice as a result. Id. (citing Commonwealth v. Pierce, 527 A.2d 973, 975-76 (Pa. 1987)). With regard to "reasonable basis," we will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." Spotz, 47 A.3d at 76 (quoting Commonwealth v. Williams, 899 A.2d 1060, 1064 (Pa. 2006)). To establish Strickland prejudice, Appellant must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. Id.

Appellant was represented by new counsel on his direct appeal, which was argued in December 2003, nearly a year after this Court's decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), which established a general rule that claims of ineffective assistance of counsel raised on direct appeal should be deferred to the collateral review (PCRA) stage. On that direct appeal, Appellant raised a challenge to the warrantless entry into his residence; recognizing that the claim was subject to being deemed waived, Appellant alternatively argued that trial counsel was ineffective in failing to litigate the claim. This was the only claim of ineffectiveness Appellant raised on direct appeal. Citing Grant, the Court deferred the claim to collateral review. Davido, 868 A.2d at 440–41. In light of Grant, the PCRA proceedings below thus represented Appellant's first opportunity to raise claims sounding in the ineffective assistance of his trial counsel. To the extent Appellant raises stand-alone arguments focusing upon his direct appeal counsel's performance on this collateral appeal, the same Strickland-

based performance and prejudice standard applies. <u>See</u> <u>Commonwealth v. Tedford</u>, 960 A.2d 1, 25 (2008) (rejecting stand-alone claim of appellate counsel ineffectiveness on ground that appellant did not demonstrate how appellate counsel's performance on direct appeal was defective pursuant to requirements of <u>Strickland</u>/<u>Pierce</u>).

## II. Suppression

Appellant initially posits that "trial counsel ineffectively failed to challenge the admission of evidence found during an illegal, warrantless search of Appellant's home in violation of his rights as guaranteed by the Fourth, Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 8, 9, and 13 of the Pennsylvania Constitution." Appellant's Brief at 12 - 13. Appellant alleges that the warrantless search was illegal because neither probable cause nor exigent circumstances existed to justify it Rather, he argues that the search was conducted simply on the basis of an anonymous 911 call and on the officers' "gut feeling" that something was not right when they responded to the call and found a quiet, seemingly deserted house. <u>Id.</u> at 13. In reliance on the mandate of <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), Appellant argues that "[v]irtually all evidence presented at trial was derivative evidence and excludable under the fruit of the poisonous tree doctrine, including Appellant's flight from police; the discovery of eyewitnesses; Appellant's statement; physical evidence later examined to establish rape; and the seizure of numerous physical items." Appellant's Brief at 24.[3]

---

[3] The exclusionary rule provides a remedy to protect the rights created by the U.S. and Pennsylvania Constitutions. The Fourth Amendment exclusionary rule has been construed by the U.S. Supreme Court as serving solely a deterrent purpose. <u>U.S. v. Leon</u>, 468 U.S. 897, 916, (1984). The exclusionary rule under Article I, Section 8 has been interpreted by this Court to serve the dual purposes of safeguarding privacy and ensuring that warrants are issued only upon probable cause. <u>Commonwealth v. Edmunds</u>, 586 A.2d 887, 899 (Pa. 1991).

Appellant also claims that trial counsel rendered ineffective assistance by failing to seek suppression of the evidence on that basis.

The Commonwealth posits, and the PCRA court determined, that the warrantless entry was supported by both probable cause and exigent circumstances. The PCRA court concluded that probable cause existed based on the 911 call that a domestic assault was occurring within the residence, and that the exigent circumstances permitting warrantless entry included the officers' reasonable belief that someone within the residence was in imminent danger. PCRA Court Opinion, 8/31/11, at 7-9 ["PCRA Ct. Op."]. Additionally, the court concluded, and the Commonwealth asserts, that the search was a constitutionally permissible "protective sweep." Alternatively, the court determined, and the Commonwealth maintains, that the challenged evidence would inevitably have been discovered, and was therefore admissible under the inevitable discovery doctrine. Appellant responds that the contours of the "independent source/inevitable discovery doctrine," as it has been fashioned in Pennsylvania pursuant to Commonwealth v. Mason, 637 A.2d 251 (Pa. 1993), and Commonwealth v. Melendez, 676 A.2d 226 (Pa. 1996), do not support admissibility of the evidence here. Appellant's Brief at 20-24.[4]

---

[4] Although they are related, the independent source doctrine and the inevitable discovery doctrine have distinct requirements. Murray v. U.S., 487 U.S. 533, 538-39 (1988). This Court has not previously addressed the differences between the doctrines. See Commonwealth v. Wiley, 904 A.2d 905 (Pa. 2006) (per curiam order dismissing appeal, as improvidently granted; separate dissents by Justices Newman and Eakin, argue that merits disposition would permit discussion of differences between inevitable discovery and independent source doctrines as exceptions to exclusionary rule). With respect to the independent source doctrine, we also note that this Court has more recently addressed Mason and Melendez in Commonwealth v. Henderson, 47 A.3d 797, 804 - 805 (Pa. 2012).

In his concurrence in this case, Mr. Justice Saylor notes that he would base rejection of the claim raised here upon inevitable discovery principles. Given our (...continued)

Warrantless entries or searches are per se unreasonable under our federal and state Constitutions, albeit subject to certain delineated exceptions. One such exception exists when there is both probable cause and exigent circumstances sufficient to excuse obtaining a warrant. Comonwealth v. Wright, 961 A.2d 119, 137 (Pa. 2008). The U.S. Supreme Court has recognized that the "Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." Mincey v. Arizona, 437 U.S. 385, 392 (1978). See also Commonwealth v. Miller, 724 A.2d 895, 900 (Pa. 1999) (limited number of circumstances will excuse police from compliance with Fourth Amendment warrant and probable cause requirements; one such circumstance occurs when police reasonably believe that someone within residence is in need of immediate aid); Commonwealth v. Norris, 446 A.2d 246, 248 (Pa. 1982) (warrantless entry into residence may be permitted, *inter alia*, "when the officers may in good faith believe that they or someone within are in peril of bodily harm."); accord Commonwealth v. Galvin, 985 A.2d 783, 795-96 (Pa. 2009).

Appellant does not dispute the validity of the doctrine that permits police to enter a residence without a warrant when they reasonably believe someone inside is in need of immediate aid. Instead, Appellant disputes the applicability of the doctrine here. Appellant argues that the circumstances simply did not support a reasonable belief that a crime had been committed, much less that someone inside the residence was in need of assistance. Appellant acknowledges that the 911 call informed the police "that there was a domestic disturbance at 26 Hager Street." Appellant's Brief at 13. Appellant then grounds much of his argument that probable cause and exigent circumstances were

---

(continued…)
disposition on grounds that the entry was lawful under the circumstances, we will not address the inevitable discovery doctrine.

lacking on the trial testimony of one of the responding officers, who related that, after receiving no response at the front and back doors, the officers "both just had a gut feeling that something was not right there." N.T. Trial, 12/5/01, at 84. Appellant dismisses the legal effect of the report of screaming and an assault on a woman, noting that the 911 call was placed anonymously and that the police saw nothing to corroborate the information the caller had provided. Appellant suggests that these circumstances should have raised an inference that the 911 call was erroneous or a prank and that no crime had occurred and no emergency existed.

The PCRA court determined, however, that the lack of any sound from within the residence or any response to the police's knock-and-announce efforts while the police were immediately responding to and investigating the report of a loud, domestic assault on a woman within the residence, supported a reasonable inference that someone inside was in need of emergency police assistance. The court opined that "the entry was based on the belief that someone was in imminent danger." PCRA Court Opinion, 12/29/11, at 7. Thus, the PCRA court concluded that there was no constitutional violation here, and that counsel had not rendered ineffective assistance by failing to seek suppression on the basis that the warrantless entry had been illegal. Appellant responds that the court's determination is not supported by the record because "[t]he officers never testified they believed anyone was in need of immediate aid, or that the suspect and/or victim were still in the house." Appellant's Brief at 19.

It is widely recognized that the potential for imminent physical harm in the domestic context implicates exigencies that may justify a limited police intrusion into a dwelling. Commonwealth v. Wright, 742 A.2d 661, 664-65 (Pa. 1999) (collecting cases). The U.S. Court of Appeals for the Ninth Circuit has recognized that "the exigencies of domestic abuse cases present dangers that, in an appropriate case, may

override considerations of privacy." U.S. v. Black, 482 F.3d 1035, 1040 (9th Cir. 2007) (quoting U.S. v. Brooks, 367 F.3d 1128, 1136 (9th Cir. 2004)). Moreover, "[c]ourts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." Brooks, 367 F.3d at 1136 (citing Tierney v. Davidson, 133 F.3d 189 (2d Cir. 1998)).

We do not suggest that domestic abuse cases create a *per se* exigent need for warrantless entry; rather, a reviewing court must assess the totality of the circumstances presented to the officer before the entry in order to determine if exigent circumstances relieved the officer of the duty to secure a warrant. We do recognize, however, that the police have a duty to respond seriously to reported domestic conflict situations, and in doing so, they must be accorded some latitude in making on-the-spot judgments as to what actions to take and what actions are reasonably necessary to protect themselves and potential victims of abuse.

The anonymity of a call reporting domestic abuse is not fatal to establishing the exigency necessary to enter a dwelling without a warrant under the totality of the circumstances. See e.g., State v. Edmonds, 47 A.3d 737, 750 (N.J. 2012) ("[A]llegations of domestic violence, even if coming from a seemingly anonymous source, cannot be breezily dismissed and must be investigated."). Here, the 911 call reporting domestic violence contained the fairly specific details that a man was beating a woman within a specifically identified residence, and a separate report indicated that screaming could be heard emanating from within that residence. Yet, when the officers arrived at the scene shortly before 8:00 a.m. on that Sunday morning, approximately three minutes after the 911 call had been received, no one answered the door, and no

sound could be heard except the unanswered ringing of a telephone within the residence.

One reason courts have recognized that deference to officers' on-the-spot reasonable judgments is particularly warranted in domestic disputes is that "the signs of danger may be masked." Fletcher v. Town of Clinton, 196 F.3d 41, 50 (1st Cir. 1999). In domestic violence situations, the victim often remains silent, or does not seek police intervention, or lies to protect the abuser for fear of retaliation. See id. (citing Bureau of Justice Statistics, U.S. Dep't of Justice, Rep. No. NCJ-167237, *Violence by Intimates* at v (1998) (noting that one of "most common reasons given by victims for not contacting the police" was that they "feared retaliation")). We also recognize, of course, that a domestic abuse victim who has been severely injured may be unable to communicate in response to an officer's investigatory efforts outside the home. Thus, the apparent exigencies of a domestic disturbance situation are not necessarily negated when officers find a quiet residence while promptly responding to a report of violence. See People v. Chavez, 240 P.3d 448, 452 (Colo. Ct. App. 2010) (exigencies heightened when officers arrived within minutes of domestic emergency call reporting physical assault but home was dark and no one answered officers' repeated knocks on front door). Whether the actions of the police are objectively reasonable is to be judged by the circumstances known to them. Black, 482 F.3d at 1040.

Here, to be sure, one explanation for the silence that confronted the officers upon their arrival and their initial attempt to confirm or refute the 911 call could have been because the 911 call was in error or not genuine. However, the non-responsiveness also could reasonably have been an indication that the 911 call was legitimate, and the silence was due to the victim's physical incapacity, intimidation by a still-present abuser, or fear of seeking police intervention. Because the report of domestic violence was

reasonably specific, and because domestic abuse cases involve inherent exigencies, we conclude that the officers' entry into the residence without a warrant to search for an injured or otherwise non-responsive domestic abuse victim was objectively reasonable under the totality of circumstances. Indeed, the officers would have been remiss in their duty had they abandoned the scene simply because no one answered the door. We agree that "[e]rring on the side of caution is exactly what we expect of conscientious police officers … where rescue is the objective, rather than a search for crime, "and [w]e should not second-guess the officers' objectively reasonable decision [to enter and search a residence without a warrant] in such a case." Black, 482 F.3d at 1040.

We reiterate that we do not recognize a per se exigency in domestic abuse situations, and we caution that entry and search in the context of a rescue is limited to proper police attempts to find a person in need of assistance, based on a reasonable belief that such a person will be inside the area searched. A reasonable belief must be based on the totality of the circumstances, which may include the exigencies inherent when a report of domestic violence is being promptly investigated. A rescue search is not a search for evidence of criminal activity; here, the officers clearly testified that their only reason for entering the residence was their concern for the safety of a potential domestic abuse victim. The police did not search for any weapons or other evidence of criminal activity. The subsequent search for evidence of criminal activity was conducted only after and pursuant to the issuance of a search warrant (the propriety of which has not been challenged below or on appeal) after the police discovered the unresponsive victim and had her transported to a hospital trauma unit. On this record, we are satisfied that the PCRA court did not err in concluding that the officers entered the home based on their reasonable belief that a victim would be found inside who needed immediate police assistance. Accordingly, we agree with the PCRA court that the

officers' entry into the home was justified under the recognized "persons in immediate need of assistance" exigency exception to the warrant requirement, and we affirm the court's denial of relief to Appellant on his derivative post-conviction claim that trial counsel were ineffective for failing to seek suppression.

### III. Dr. Ross's Testimony[5]

On direct appeal, Appellant unsuccessfully challenged the admissibility of the expert testimony of forensic pathologist Dr. Ross on the basis that his conclusions regarding the cause of death were not based upon a reasonable degree of medical certainty. On this PCRA appeal, Appellant claims that Dr. Ross's testimony regarding G-forces, his observation during the post-mortem exam of a shearing or tearing injury, and his failure to notice any evidence of an aneurysm was false, misleading, and "unreliably speculative," and that prior counsel were ineffective for failing to litigate this issue. Appellant's Brief at 29. Appellant additionally claims that Dr. Ross's trial testimony regarding G-forces and shearing injury constituted a discovery violation, that his testimony that the victim had been strangled and raped was false, and that prior counsel were ineffective for failing to litigate these issues. Appellant further alleges that trial counsel were ineffective in failing to effectively cross-examine Dr. Ross, impeach his credibility, or successfully rebut his testimony with the testimony of a credible expert witness. The Commonwealth responds, *inter alia*, that Appellant has failed to establish

---

[5] As we turn to Appellant's remaining issues, we note that a theory pursued by Appellant both at the PCRA hearing and in the present appeal, which is implicated in a number of the arguments presented, is that the blows Appellant inflicted upon the victim were not intended to kill her and were demonstrably not severe enough to kill her. In support of a number of his issues, Appellant contends that the victim died of intra-cranial bleeding caused by a ruptured brain aneurysm, and that counsel were ineffective in failing to adequately pursue and present various aspects of this theory.

the merit of any of his multiple claims of ineffectiveness arising with regard to Dr. Ross's testimony.

### a. Discovery Violation

Appellant first claims that Dr. Ross's testimony exceeded the scope of what was contained in his expert report and, thus, constituted a discovery violation.[6] Appellant alleges that "[h]ad counsel known the actual content of Dr. Ross's proposed testimony, counsel could have successfully precluded it" under Pa.R.Crim.P 573(E), which, *inter alia*, provides that the court may prohibit a party from introducing evidence not properly disclosed in pre-trial discovery. Appellant's Brief at 38. The Commonwealth responds that Appellant is not entitled to relief on this ineffectiveness claim because the underlying issue lacks merit. The PCRA court held that there was no discovery violation because although Dr. Ross used certain terms and phrases in his testimony that were not used in his report, these were "descriptive terms" that were not different in substance or meaning from those used in his report. PCRA Ct Op. at 3.

The basis of Dr. Ross's trial testimony was his post-mortem report, a copy of which was supplied to the defense in pre-trial discovery. At trial, defense counsel objected to Dr. Ross's testimony regarding G-forces and shearing injury, not on the basis that the testimony amounted to a discovery violation, but because it was "well beyond the scope of the report and offer of proof." N.T. Trial, 12/7/01, at 453. Appellant concedes as much. Appellant's Brief at 32-33. At the PCRA hearing, trial counsel testified that Dr. Ross's testimony regarding G-forces was no surprise, and that counsel knew Dr. Ross had previously testified regarding the effect of G-forces in the

---

[6] Appellant relies on Pa.R.Crim.P. 4003.5(c), which provides that "the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto." Id.

causation of traumatic brain injury in unrelated cases in Lancaster County, where the admissibility of such testimony had been litigated and upheld. Counsel testified that he "knew [the testimony] was coming," that the testimony "was not unexpected," and that "we knew we wouldn't win a battle to keep it out." Thus, counsel testified that the defense strategy with respect to this anticipated testimony had been to present a defense expert in rebuttal. N.T. PCRA Hearing, 6/23/09, at 220-23.

At trial, Appellant indeed presented forensic pathologist Dr. John Shane, who testified that, in his opinion, Dr. Ross's testimony regarding G-forces was "highly speculative." N.T. Trial, 12/11/01, at 845-46, 867. Dr. Shane also testified that he had examined microscopic slides of the victim's brain tissue and saw no shearing or tearing, and he opined that there was "nothing in [Dr. Ross's] report that describes tearing of the brain tissue." Id. at 869. In Dr. Shane's opinion, the cause of the victim's death was a subarachnoid hemorrhage concentrated at the base of the brain that occurred without a shearing or tearing injury to the deep interior of the brain. He testified that he did not believe the blows to the head the victim had sustained were "severe enough to cause subarachnoid or subdural bleeding," and suggested instead that the victim had a "pre-existing injury" which contributed to the fatal subarachnoid hemorrhage. Id. at 867.

We find that counsel was not ineffective in failing to argue a discovery violation here, as counsel had received the report, was aware of the expected substance of Dr. Ross's testimony, and indeed, as a matter of trial strategy, had presented the testimony of Dr. Shane to rebut the damaging aspects of Dr. Ross's conclusions regarding G-forces and shearing injury. Notably, the discovery violation objection Appellant identifies arose only when Dr. Ross's trial testimony allegedly exceeded the substance of his pre-trial report. However, Appellant concedes that counsel, in fact, objected to

the testimony on that basis, and that the objection was overruled. In these circumstances, appellant's ineffectiveness claim necessarily fails.

### b. Dr. Ross's Alleged False, Misleading and Unreliable Testimony

Moving now to Appellant's related ineffectiveness claim, premised upon an allegation that Dr. Ross's testimony was "false, misleading and unreliable," we reiterate that on direct appeal, Appellant claimed that the trial court had erred in permitting the testimony because it was "speculative." The foundation for that claim of trial court error was Dr. Ross's description of the shearing and tearing of brain tissue going to the center of the brain, resulting from blunt force trauma delivered with hundreds of "Gs" of force, and the absence of any mention in the report regarding how those forces had been calculated. We determined that the issue lacked merit because Dr. Ross had testified to the cause of death based upon "first hand observations" of "shearing and twisting" injury, and had concluded that the cause of death had been a brain injury suffered as the result of blunt force to the victim's head. Davido, 868 A.2d at 442. We held that "[t]he reference to the number of 'g forces' was merely a descriptive term used to describe that the victim was hit with force; it was not a linchpin as to the cause of death. … Accordingly, Dr. Ross's testimony was not speculative and the trial court did not abuse its discretion in admitting it at trial." Id.

Appellant argues now that this Court was "misled" in considering the G-forces aspect of the testimony on direct appeal. Appellant's Brief at 36. He claims that Dr. Ross's "testimony about a shearing injury was the linchpin as to both the cause of death and specific intent." Id. Appellant's precise claim is that Dr. Ross's testimony was not actually based on "first hand observations" of a shearing injury, but merely on his observation of a subarachnoid hemorrhage, which can result from either a shearing

injury or a ruptured aneurysm.[7]  Id. at 29.  Appellant claims that Dr. Ross improperly excluded a ruptured aneurysm as the cause of the subarachnoid hemorrhage he did observe. Thus, Appellant claims, once again, that "it is now clear that [Dr. Ross's] testimony was **not** based on a reasonable degree of medical certainty," and that counsel was ineffective in failing to litigate the claim.  Id. at 36. (emphasis in original).

The PCRA court dismissed this claim as previously litigated.  We note that "a PCRA petitioner cannot obtain additional review of previously litigated claims by presenting new theories of relief[.]"  Commonwealth v. Sneed, 45 A.3d 1096, 1112 (Pa. 2012) (citing Commonwealth v. Wharton, 811 A.2d 978, 984 (Pa. 2002)).  Here, the claim regarding shearing injury is sufficiently distinct from the claim regarding G-forces as to avoid the prior litigation bar, because it is based ultimately on the assertion that Dr. Ross erroneously ruled out a ruptured aneurysm, while the former claim was that his testimony regarding G-forces was not scientifically supportable.

Appellant concedes that there was no direct evidence presented at trial or at post-conviction proceedings to show that the victim in fact had an aneurysm.  At the PCRA hearing, Appellant presented the testimony of an expert in emergency medicine, Dr. Angelo Scotti, and of an expert pathologist, Dr. Charles Wetli.  Both experts conceded that the clinical record did not contain direct evidence of an aneurysm, but both opined that an aneurysm was the likely cause of the victim's fatal subarachnoid hemorrhage, based on their opinions that the constellation of injuries revealed post-mortem failed to support the finding of a shearing injury resulting from a blow or blows to the head.  Both experts testified that definitive proof of a ruptured aneurysm would have been revealed by dissection of a structure in the brain called the Circle of Willis

---

[7] The medical evidence at trial reflected that a shearing injury is typically caused by a forceful blow or blows to the head, while a pre-existing brain aneurysm can rupture as the result of little or no outside force.

and the vascular supply to the base of the brain. N.T. PCRA Hearing, 6/26/09, at 593-94, 620-22.

Dr. Ross's post-mortem report stated that the Circle of Willis was intact and that no aneurysms were identified. At the PCRA hearing, he testified that although his post-mortem report did not state that he had dissected the Circle of Willis, his standard practice, particularly where brain injuries of this type are present, would have been to do so. He testified that "The Circle of Willis was intact. … [I]n order to say the Circle of Willis is intact … [y]ou've got to dissect it out." Id. at 674.

Dr. Ross further testified that the subarachnoid hemorrhage was, in fact, more consistent with shearing injury than a ruptured aneurysm. Specifically, he testified as follows:

> If there were an aneurysm, it would have ruptured. The blood clot would have been confined to the posterior cranial fossa and she would have died rather quickly without any hemorrhage, significant hemorrhage, or swelling[.]

> ****

> You have hemorrhage all throughout the brain. You have swelling throughout the brain. You have over eleven different areas of bruises to all regions of the scalp all due to blunt force trauma. That tells you that you have a traumatic brain injury. The swelling to this brain is classic for diffuse axonal injury.

> ****

> When you look at the constellation of findings, the bruises on the scalp, you look at the swelling to the scalp, you look at the subarachnoid hemorrhage all over the brain as well as

the base of the brain, that tells you that you are dealing with diffuse axonal injury.[8]

Id. at 678-80.

On this record, appellant has not demonstrated that counsel was ineffective for failing to further challenge Dr. Ross's testimony as false, misleading and unreliable. Appellant produced experts on collateral attack who disagreed with Dr. Ross's opinions, but that does not prove that Dr. Ross's different view was false or unreliable. Moreover, put to the challenge on collateral attack, Dr. Ross made clear that he did not haphazardly rule out a ruptured aneurysm as the cause of the subarachnoid hemorrhage he observed. To the contrary, he testified that he considered the relevant medical factors in ruling out, to a reasonable degree of medical certainty, a ruptured aneurysm as the cause of death. The determination was based on a number of observable factors, including bleeding and swelling throughout the brain, numerous contusions to the head, and an intact Circle of Willis. Accordingly, Appellant's claim that trial counsel was ineffective for failing to argue that Dr. Ross's testimony on this point was false, misleading, and unreliable lacks merit.

**c. Failure to Adequately Cross-Examine or Impeach Dr. Ross**

Appellant next characterizes trial counsel's cross-examination of Dr. Ross as "limited and perfunctory," and therefore ineffective. Appellant's Brief at 42. The PCRA court rejected this claim as meritless and lacking in proof of prejudice. PCRA Ct. Op., at

---

[8] The medical evidence at trial reflected that "diffuse axonal injury" is the result of traumatic shearing forces that occur when the head is rapidly accelerated or decelerated by twisting and rotation upon impact, as may occur in automobile accidents, falls, and assaults. All experts agreed that shearing injury is not easily diagnosed by imaging studies such as CT scans or MRI exams; that the actual tearing of axons is generally best seen microscopically; and that while tearing or shearing of white matter can be seen by direct visual observation, the tears are typically very small and may be obscured.

3.  Appellant's claim is belied by the record, which reflects that counsel questioned Dr. Ross extensively about the absence of fractures to any bones in the victim's face or head, fractures which might be expected when blows are significant enough to cause a subarachnoid hemorrhage.  Counsel also questioned Dr. Ross about the absence of a fracture to the hyoid bone in the victim's neck and the absence of petechial hemorrhages in her eyes, injuries which might be expected when a person has been strangled.  Additionally, counsel established on cross-examination that Dr. Ross could not determine with absolute certainty whether the bleeding within the subarachnoid space had been the result of a direct trauma from "outside" or "inside" the brain.  N.T. Trial, 12/7/01, at 477.  Counsel also established that a chart notation on the "Trauma Resuscitation Sheet" indicated that "no direct genital trauma" had been seen.  Id. at 475.

Appellant nevertheless claims that counsel's cross-examination of Dr. Ross was deficient because counsel did not ask Dr. Ross whether he had actually observed any shearing or tearing injury, or ask why Dr. Ross took no photographs of the intact Circle of Willis to document that no aneurysm had been observed.  We disagree.  "A claim of ineffectiveness generally cannot succeed 'through comparing, in hindsight, the trial strategy employed with alternatives not pursued.'"  Sneed, 45 A.3d at 1107 (quoting Commonwealth v. Miller, 819 A.2d 504, 517 (Pa. 2002)).  Where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he or she chose a particular course that had some reasonable basis designed to effectuate his or her client's interests.  Id. (citing Commonwealth v. Colavita, 993 A.2d 874, 887 (Pa. 2010)).  "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued."  Id.

Here, the record reflects that trial counsel attempted to discredit Dr. Ross's testimony when he presented the testimony of Dr. Shane, who opined that 1) Dr. Ross's testimony was speculative; 2) the microscopic slides that Dr. Shane had examined showed no shearing or tearing of deep-brain tissue; 3) the cause of death was a subarachnoid hemorrhage; and 4) the blows to the victim's head were not severe enough to have caused the subarachnoid hemorrhage which caused her death. Dr. Shane additionally testified that the victim's brain tissue showed evidence of "gliosis" or "fibroblast" or old scarring, indicating a "pre-existing" injury, and that in his opinion, the "hemorrhage at the base of the brain speaks for an older injury." N.T. Trial, 12/11/01, at 844. Dr. Shane testified that if the blows to the head been severe enough to cause the fatal hemorrhage, the brain would have exhibited "coup-contracoup" contusions or bruising and that such injuries were not present here. Id. at 839, 846. Additionally, Dr. Shane testified that the wounds to the victim's genitals were superficial and could have been the result of consensual sex, and that the marks on her throat were not consistent with strangulation. As previously explained, counsel testified at the PCRA hearing that his main trial strategy for discrediting the testimony of Dr. Ross had been to present the countervailing expert testimony of Dr. Shane.

The record establishes that the strategy chosen by counsel had a reasonable basis designed to effectuate Appellant's interests, and Appellant has failed to show that the suggested alternative strategy of additional questioning offered a reasonable probability of a different outcome. Thus, we determine that the PCRA court did not err in denying relief on this claim.

**d. Failure to Adequately Rebut Dr. Ross's Testimony**

Appellant next argues that trial counsel was ineffective in presenting the testimony of Dr. Shane despite counsel's belief that Dr. Shane was not a credible

witness.[9] The general thrust of Appellant's argument is that counsel should not have presented Dr. Shane as an expert witness because he could not testify that, in his opinion, the subarachnoid hemorrhage that caused the victim's death had been the result of a ruptured aneurysm. Appellant points to the PCRA testimony of Drs. Scotti and Wetli as support for his contention that Dr. Shane was a poor defense expert in this regard, and then asserts that trial counsel was ineffective in failing to identify, locate and present an expert who could affirmatively testify that the victim had died as the ultimate result of a ruptured brain aneurysm, and not a diffuse axonal injury.

[9] Appellant grounds this claim on a memorandum in counsel's file documenting that the defense initially did not intend to call Dr. Shane as an expert witness due to his demeanor and mannerisms, and because his opinion that the ingestion of barbiturates may have been a contributing factor in the victim's death would likely have been discredited at trial by laboratory tests and records confirming that the barbiturates had been administered during the victim's treatment in the trauma unit. Additionally, the memorandum noted counsel's concern that Dr. Shane seemed unprepared and had appeared to be reading the medical records for the first time at his initial meeting with counsel. When questioned about the memo at the PCRA hearing, counsel testified that ultimately, although undocumented, he had obviously had "a change of heart" regarding Dr. Shane's credibility "or he [Dr. Shane] would never have set foot in this courtroom." N.T. PCRA Hearing, 6/23/09, at 242. More directly to the point, counsel testified as follows:

> Dr. Shane is an odd person. His mannerisms are physically and facially odd. He was willing to say about anything that we would ask him to say[.] …Those were concerns that we had. We sat down and discussed those concerns. Ultimately, we ended up using Dr. Shane and limiting him to specific issues that we knew that he would work well for us on and we thought he was credible on, and the opinions we found to be credible. And I say that based on the medical evidence that was out there, opinions that made sense, opinions that[,] in my opinion, a jury would find reasonable and credible and opinions that were based on facts that could be proven.

Id. at 232. The PCRA court credited counsel's testimony. PCRA Ct. Op. at 4.

At the PCRA hearing, trial counsel testified that Dr. Shane explored the "possibility that an aneurysm was at play," but he couldn't "find anything with certainty." N.T. PCRA Hearing, 6/23/09, at 225. Counsel testified that "Dr. Shane didn't find an independent causation for her brain injury." Id. at 224. Nevertheless, the record is clear that Dr. Shane disputed the finding of a diffuse axonal injury because he saw no evidence of shearing or tearing and because, in his opinion, the victim had not been struck with sufficient force to cause shearing or tearing. Dr. Shane's opinion in this regard was, in fact, not dissimilar to the opinions expressed by Drs. Scotti and Wetli, both of whom testified that the trauma evident on the victim's body did not appear severe enough to have caused the fatal subarachnoid hemorrhage. Moreover, although Dr. Scotti testified within a reasonable degree of medical certainty that the cause of the fatal hemorrhage was a ruptured aneurysm, Dr. Wetli's opinion in that regard was less certain. Dr. Wetli testified only that an aneurysm was a "likely" cause, but that ultimately, "the cause of [the] subarachnoid hemorrhage is undetermined." N.T. PCRA Hearing, 6/26/09, at 623.

Further, Dr. Wetli agreed that the manner of death was homicide because the evidence suggested that an aneurysm in the victim's brain had ruptured as a result of the physical altercation with Appellant. Dr. Scotti agreed that an aneurysm had existed and had burst as the result of a combination of a physical altercation with Appellant and a fall "down the steps." Id. at 575, 585. Based on this apparent agreement among the experts that the manner of death was homicide regardless of what precise event or combination of events had caused the fatal hemorrhage, the PCRA court determined that counsel had had a rational basis for presenting Dr. Shane as a witness, despite Dr. Shane's inability to testify with certainty to the existence of a ruptured aneurysm. The court quoted with approval counsel's PCRA testimony that, "at the end of the day

[whether the cause of the hemorrhage was an aneurysm or a shearing injury] wasn't an important issue … because, at best, it probably gave us an eggshell victim, and I'm not sure where that got us anyway." N.T. PCRA Hearing, 6/23/09, at 228; PCRA Ct. Op. at 4.

Appellant now argues that the PCRA court erred, in part, because counsel's testimony on this point "betrays a basic misunderstanding of the facts, the law or both, and hence is unreasonable." Appellant's Brief at 50. In support of this contention, Appellant argues that "causation" was properly conceded, that he had "admitted striking the decedent during an altercation[,]" and that "this case has never been about causation[,]" but instead "has always been about specific intent." Id. at 53. Appellant argues that Dr. Ross's testimony supported a finding of specific intent to kill based on repeated forceful blows to the head, and that "a showing that the decedent suffered a burst aneurysm during a far less violent altercation … would have rebutted the Commonwealth's case for specific intent." Id. at 51.

Appellant's argument fails because the record reflects that counsel's strategy, in fact, had been to show that Appellant lacked the specific intent to kill. Counsel pursued a number of avenues to establish the lack of specific intent to kill, not the least of which was the rebuttal testimony of Dr. Shane, who, as explained, testified that the fatal hemorrhage was not caused by forceful blows to the head inflicted by Appellant (as Dr. Ross had opined), but that the hemorrhage had been triggered by a "pre-existing" injury.

Moreover, counsel was aware that disputing the specific intent to kill was the crux of the defense case. During his opening statement, counsel argued that the Commonwealth had to show "specific, fully formed and conscious" intent to kill, and that whether Appellant had acted with the specific intent to kill was "a critical issue in this case." N.T. Trial, 12/5/01, at 39. Counsel's closing encompassed eighteen pages of

transcript, and he argued throughout that the facts failed to establish that Appellant had acted with the specific intent to kill. N.T. Trial, 12/11/01, at 886-903. Counsel concluded by telling the jury that "the critical question you have to ask yourself is, is it specific, fully formed and conscious intent to kill?[,]" and suggested that if the jury found a reasonable doubt as to the existence of that intent, it should then "consider the lesser degrees of homicide" and return with an appropriate verdict. Id. at 902-03.

Accordingly, Appellant has not proved the performance element of Strickland. The record establishes that the strategy chosen by counsel had a reasonable basis designed to effectuate Appellant's interests. Moreover, Appellant has failed to show that the suggested alternative strategy identified by his hindsight approach (presenting an expert who would opine that a ruptured aneurysm was the cause of the fatal hemorrhage) offered a reasonable probability of a different outcome at trial. Thus, the PCRA court's denial of relief on this claim is supported by the record and cannot be disturbed.

## IV. Voluntary Manslaughter

Appellant next alleges that trial counsel failed to adequately investigate and prepare a "heat of passion" voluntary manslaughter defense. Appellant's Brief at 56. Appellant recognizes that trial counsel in fact did present facts which could have supported a jury finding that Appellant's culpability rose no higher than voluntary manslaughter, and that the trial court charged the jury on the elements of voluntary manslaughter.[10] Nevertheless, Appellant faults counsel for not presenting a better case.

---

[10] Heat of passion voluntary manslaughter is defined in the Crimes Code as follows:

> **(a) General rule.** --A person who kills an individual without lawful justification commits voluntary manslaughter if at the

(…continued)

The PCRA court noted that, even though it instructed the jury on voluntary manslaughter at trial, Appellant's collateral claim fails in light of Appellant's refusal to admit an intent to kill. PCRA Ct. Op., at 4-6.

Appellant acknowledges that trial counsel argued to the jury, *inter alia*, that the 'triggering event [and] provocation" for the "angry dispute" that "ends with Angie Taylor in the hospital" was that "Angie makes some comment to Ted about engaging in a sexual act with his brother, Spanky Davido; specifically an oral sexual act with Spanky Davido." N.T. Trial, 12/5/01, at 33. Appellant also concedes that counsel, on direct examination of Appellant, elicited testimony that "the argument began when Ms. Taylor told him that she had oral sex with his brother, Spanky." Appellant's Brief at 57. Additionally, Spanky Davido testified that Appellant was "upset" and "angry" and "mad" when he confronted Spanky with the accusation that "[Angie] said that she sucked your d**k." N.T. Trial, 12/6/01, at 295-96. The thrust of Appellant's argument on appeal is that counsel should have done more to corroborate Appellant's testimony that the victim told him she had performed oral sex on his brother by presenting the testimony of Stephanie Tsamutalis (Spanky's girlfriend, who lived in the residence and witnessed the events).

---

(continued…)
> time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed[.]

18 Pa.C.S. § 2503(a). Here, the court instructed the jury that voluntary manslaughter is not murder, but is committed when a defendant, without malice, kills another person intentionally and in the heat of passion, following serious provocation by the other person, without sufficient intervening time for the passion to cool. See N.T. Trial, 12/12/01, at 977-78.

At the PCRA hearing, counsel testified that he was aware that Ms. Tsamutalis had given the police a statement indicating that "Teddy [Appellant] was yelling and saying Angie told him she sucked Spanky's d**k[.]" N.T. PCRA Hearing, 6/24/09, at 273. Ms. Tsamutalis told police that she had then asked Ms. Taylor, "Angie why are you saying that? Is this true? And Angie [said] that she told Teddy that[,]" but that it had not been true. Id. at 274.

Counsel testified that he decided not to call Ms. Tsamutalis because he "had significant concerns about asking [her] any questions that had the potential to open the door to [Appellant's] prior bad behavior with other women because we had a bad history with other women that we wanted to keep out." N.T. PCRA Hearing, 6/23/09, at 200. Counsel's reasoning in this regard was based on the fact that Ms. Tsamutalis had also told the police that Appellant had been making accusations of a sexual tryst between Spanky Davido and Ms. Taylor for approximately one week. In addition, other witnesses could confirm that Appellant had a history of accusing his former girlfriends of having sex with his brother Spanky, and that Appellant had committed aggravated assault against a former girlfriend in an incident arising out of such an accusation. The record thus supports a finding that the strategy chosen by trial counsel had a reasonable basis designed to effectuate Appellant's interests, and Appellant has failed to show that the suggested alternative strategy, identified by a hindsight comparison, offered a reasonable probability of a different outcome. Thus, the PCRA court's denial of relief on this claim was proper and supported by the record.

Appellant also argues that trial counsel was ineffective in failing to present expert mental health testimony showing that Appellant acted from a sudden, impassioned, and seriously provoked state of mind when the victim told him that she had performed oral sex on his brother. The PCRA court reiterated that the fact of Appellant's refusal to

concede the intent to kill, including the aspect of intention required for voluntary manslaughter, rendered any such evidence irrelevant and, in any event, pursuit of the theory also would have opened the door to unsavory evidence regarding Appellant's past violence against women. PCRA Ct. Op., at 4-6.

Appellant relies, in part, on the PCRA testimony of his expert forensic psychologist, Dr. Lawrence Donner, who conducted a neuropsychological evaluation of Appellant prior to trial for purposes of establishing potential mental health mitigation evidence.[11] Dr. Donner testified that trial counsel had not discussed a heat-of-passion defense with him, but that the results of his examination of Appellant would have supported such a defense. Dr. Donner admitted, however, that Appellant had never indicated to him that he had flown into an uncontrollable rage when the victim told him she had performed oral sex on his brother. Instead, Dr. Donner stated that when he asked Appellant about the psychological impact of hearing that news, Appellant changed the subject, and "so it was never discussed." N.T. PCRA Hearing, 6/25/09, at 524. Importantly, Dr. Donner also testified that his diagnostic testing revealed that Appellant is manipulative and controlling of women. Accordingly, had trial counsel presented Dr. Donner's expert mental health testimony regarding the intense passion element of voluntary manslaughter, it would have opened the door to potentially damaging rebuttal evidence. Thus, we determine, as did the PCRA court, that counsel had a reasonable basis for not presenting such evidence.

Moreover, Appellant's claim that counsel failed to adequately present evidence of voluntary manslaughter is belied by the record. Although the jury ultimately determined that Appellant's culpability rose to a higher level of guilt than voluntary manslaughter, a

---

[11] Ultimately, Dr. Donner did not testify at trial, in light of Appellant's decision to waive the presentation of mitigating evidence.

claim of ineffective assistance cannot be made out simply because a reasonable defense strategy presented at trial was not successful. Thus, we conclude that trial counsel's efforts were adequate to meet the applicable Sixth Amendment standard, and that trial counsel did not render ineffective assistance by failing to present expert mental health testimony regarding either the serious provocation or sudden and intense passion elements of the defense of voluntary manslaughter.

In arguing that counsel rendered ineffective assistance by not presenting a more compelling case for voluntary manslaughter at trial, Appellant also claims that trial counsel conceded that the killing was committed with malice, and thus negated the heat-of-passion defense in favor of a potential third-degree murder conviction. Appellant's characterization is not an entirely fair representation of the record. It is true that, in arguing for the propriety of a third-degree murder verdict, counsel stated that the facts showed the existence of malice and the lack of specific intent, see N.T. Trial, 12/11/01, at 888, but counsel clearly did not foreclose the jury's consideration of an alternative, lesser verdict. Indeed, after arguing that third-degree murder would be an appropriate verdict, counsel returned to arguing the existence of facts that supported a finding of voluntary manslaughter. See id. at 891-92.

Nevertheless, the main focus of counsel's defense strategy was to challenge the element of specific intent, which would tend to negate a finding of voluntary manslaughter, as intent is an element of that crime. At the PCRA hearing, trial counsel testified that his options with respect to presenting a voluntary manslaughter defense were restricted by Appellant's insistence that no defense be presented that conceded intent. Appellant argues now that counsel misapprehended the law because the statute defining voluntary manslaughter "does not include a requirement that a defendant admit intent before being able to avail himself of this defense." Appellant's Brief at 61-62.

But, contrary to Appellant's assertion, voluntary manslaughter in fact is differentiated in the law from third-degree murder by the requirement of intent. See Commonwealth v. Pitts, 404 A.2d 1305, 1308 (Pa. 1977) ("Murder of the third degree is a killing done with legal malice but without specific intent to kill. Voluntary manslaughter, on the other hand, involves the specific intent to kill but, by reason of passion and provocation, contains no legal malice.")

Here, counsel had to tread with care in presenting to the jury these alternative defenses to first-degree murder. This is so because third-degree murder and voluntary manslaughter are internally inconsistent with and mutually exclusive of each other, with respect to the elements of malice and intent. Given Appellant's insistence that he did not intend to kill Ms. Taylor, and that her death was accidental and unintentional, and given the uncontroverted facts and admissions that Appellant struck the victim repeatedly, we cannot conclude that counsel's presentation of facts and argument tending to show, *inter alia*, the presence of malice but the lack of specific intent, was constitutionally deficient.[12] Thus, the PCRA court's denial of relief on this claim is supported by the record.

## V. Maureen McGarrity's Testimony

Appellant next argues that the trial testimony of sexual assault forensic examiner Maureen McGarrity was "false, inaccurate and misleading," and that counsel rendered ineffective assistance by failing to raise or litigate this issue. Appellant's Brief at 66. The gravamen of Appellant's claim is that Ms. McGarrity testified that she observed

---

[12] Moreover, Appellant made it clear to counsel that his ultimate desire was to secure an outright acquittal on the theory that the victim's death was  not the result of his actions at all, but was  caused by some undetermined, coincidental fatal brain abnormality. Obviously, the prospect of securing an outright acquittal was a difficult task for counsel given the facts adduced at trial.

abrasions, contusions, and lacerations in the victim's vaginal area when, according to Appellant, only abrasions and contusions actually existed. Appellant cites definitions contained in a forensic pathology textbook to establish that abrasions are less severe injuries than lacerations, and on that basis, he alleges that trial counsel was ineffective in failing to adequately cross-examine or otherwise impeach Ms. McGarrity. Appellant further argues that counsel's ineffectiveness affected the guilt phase of his trial, because had the "inconsistency" in Ms. McGarrity's testimony been properly rebutted, he likely would not have been convicted of rape. Appellant's Brief at 68. Appellant additionally claims that counsel's deficient performance prejudiced him at the penalty phase because "the rape conviction established the sole aggravating factor" found by the jury to support the sentence of death. Id. at 69. The PCRA court noted that Dr. Ross, who performed the autopsy on the victim, corroborated Ms. McGarrity's testimony in both his report and his testimony, albeit he used a different term, "denuded," than "lacerations." The court concluded that trial counsel's basis for not seeking to rebut this evidence -- Appellant and the victim were in a consensual sexual relationship and placing emphasis on sexual injuries would not be advantageous -- was reasonable. PCRA Ct. Op. at 18.

At trial, counsel presented the testimony of Dr. Shane to rebut the evidence of rape. Specifically, Dr. Shane testified that the only vaginal injuries found on the victim were "bruising" to the labia and a "superficial abrasion" inside the vagina, and that those injuries are not consistent with rape, but are quite common when couples "engage in very vigorous sex" that is consensual. N.T. Trial, 12/11/01, at 857-58. Appellant testified in his own defense at trial that he and the victim had engaged in consensual sex several times in the hours before the altercation started. The record supports that counsel's strategy of rebutting the testimony of Ms. McGarrity with that of Dr. Shane and

Appellant was a reasonable one, designed to effectuate Appellant's interests, and thus the PCRA court did not err in determining that Appellant was not entitled to relief on this claim of ineffectiveness.

## VI. Brady Violation - Failure to Impeach Jailhouse Informants

Appellant next alleges that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to the defense the mental health treatment records of Matthew Kauffman and Anthony Brown, the jailhouse informants who testified for the Commonwealth. Appellant argues that the treatment records would have permitted defense counsel to impeach the credibility of these witnesses. Alternatively, Appellant claims that trial counsel rendered ineffective assistance by failing to adequately investigate the mental health backgrounds of these witnesses "for possible impeachment purposes." Appellant's Brief at 72. Specifically, Appellant alleges that Brown had a psychological history including chronic depression, post-traumatic stress disorder, intermittent explosive disorder, alcohol and substance abuse, and a serious suicide attempt. Appellant alleges that Kauffman similarly had a history of depression, attention deficit disorder, substance abuse, and attempted suicide. Appellant claims that had counsel investigated these histories and presented them, "the jury would have been able to assess whether Kauffman[']s and Brown's mental illness affected their ability to tell the truth and remember conversations accurately." Id. at 75.[13] The Commonwealth responds that neither claim has merit.

---

[13] We note that Appellant does not allege counsel's ineffectiveness for failing to previously raise the allegation of a Brady violation. Accordingly, we could dispose of this issue on the basis of waiver. See Commonwealth v. Roney, 79 A.3d 595, 609 (Pa. 2013) (holding claim of alleged Brady violation waived on collateral appeal for failure to raise it at trial or on direct appeal). However, the Commonwealth has not argued waiver, and the trial court decided the issue on the merits. We undertake a merits disposition of the claim because we see substantive review as the most efficient manner of resolving the question raised in this instance.
(…continued)

The mental health records of the witnesses were admitted into evidence at the PCRA hearing. The PCRA court noted that both witnesses were cross-examined rigorously at trial and rejected Appellant's ineffectiveness claim on the ground that it lacked arguable merit, because Appellant had not shown that the witnesses' alleged mental health disabilities negatively affected their abilities to accurately perceive or recall events. The court rejected the Brady claim on the ground that Appellant had failed to show that the Commonwealth had even been in possession of the records at issue. PCRA Ct. Op. at 19-20.[14]

We addressed the Brady rule in Commonwealth v. Weiss, 986 A.2d 808 (Pa. 2009):

> In Brady, the United States Supreme Court declared that due process is offended when the prosecution withholds evidence favorable to the accused. … The Brady court established the obligation of the prosecution to respond affirmatively to a request for production of exculpatory evidence with all evidence material to the guilt or punishment of the accused. Where evidence material to the guilt or punishment of the accused is withheld, irrespective of the good or bad faith of the prosecutor, a violation of due process has occurred.

Id. at 814 (quoting Commonwealth v. Strong, 761 A.2d 1167, 1171 (Pa. 2000)).

_____

(continued…)

[14] In a corollary argument, Appellant claims that Kauffman had a poor reputation for truthfulness in the community, and that had counsel investigated, he would have discovered witnesses to so testify, and that counsel's failure to do so rendered his assistance ineffective. The PCRA court did not address this corollary claim in its opinion accompanying its order denying relief. We note that the questions raised in this corollary issue and in the immediately preceding issue with respect to Maureen McGarrity's testimony were not contained in the original PCRA petition filed in May 2008, but were presented to the court in a supplemental petition filed in June 2009, less than two weeks before the hearing. Under the circumstances, there was no error by the PCRA court in not addressing this issue.

In United States v. Bagley, 473 U.S. 667, 676 (1985), the U.S. Supreme Court concluded that "impeachment evidence … as well as exculpatory evidence, falls within the Brady rule," and held that, regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. Importantly, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." Commonwealth v. McGill, 832 A.2d 1014, 1019 (Pa. 2003). "[I]n order to be entitled to a new trial for failure to disclose evidence affecting a witness'[s] credibility, the defendant must demonstrate that the reliability of the witness may well be determinative of his guilt or innocence." Commonwealth v. Johnson, 727 A.2d 1089, 1094 (Pa. 1999). See also Commonwealth v. Moose, 602 A.2d 1265, 1272 (Pa. 1992) (when reliability of witness may be determinative of guilt or innocence, non-disclosure of evidence affecting witness's credibility runs afoul of Brady disclosure requirement).

When a witness suffers from a mental disability relevant to his or her ability to accurately observe, recall or report events, the jury must be informed of the disability in order to assist it in properly assessing the weight and credibility of the witness's testimony. Commonwealth v. Rizzuto, 777 A.2d 1069, 1082 (Pa. 2001), abrogated on other grounds. The evidence can be said to affect credibility when it shows that the witness's mental disorganization impaired his or her capacity to observe an event at the time of its occurrence, to maintain a clear recollection of it, or to communicate the observation accurately and truthfully at trial. Id.

Here, the PCRA court determined that Appellant made no showing below that either witness's credibility was affected by an alleged mental disturbance that negatively

impacted his abilities to accurately observe, recall, or communicate the facts to which he testified. In this appeal, apart from a single, fleeting, unsupported assertion that "depression … has a known potential impact on cognition and memory[,]" Appellant's Brief at 76, Appellant again makes no attempt to link a specific diagnosis or mental condition suffered by either witness to a claim that the witness was unable to accurately observe, recall, or communicate the facts to which he testified. Instead, Appellant appears to argue, in cursory and speculative fashion, that any and all alleged mental health problems of the witnesses had relevant potential impeachment value: "Had Brown's and Kauffman's mental health problems been put before the jury, the jurors could have considered those issues in its [sic] determination of their credibility." Id. at 74.

Appellant's substantive claim of a Brady violation is meritless. Only mental health disabilities that impair a witness's ability to observe, recall, or report events, are relevant and admissible to impeach a witness's credibility. Rizzuto. Here, Appellant fails to show that either witness had an impaired ability to accurately observe, recall or report events due to a mental illness. Appellant has likewise failed to show that the evidence allegedly withheld was material to the guilt or punishment of the accused. Johnson. Thus, Appellant has not shown a reasonable probability of a different outcome had the alleged impeachment evidence been disclosed. Weiss, 986 A.2d at 815 - 816. Given this analysis, we also determine that the PCRA court's denial of Appellant's claims of ineffective assistance of counsel in this regard was supported by the record.

Additionally, we reject Appellant's corollary claim that counsel rendered ineffective assistance by failing to locate and produce witnesses to testify to Kauffman's poor reputation for truthfulness. During cross-examination at trial, counsel established

inconsistencies in Kauffman's prior statements, and established that Kauffman had not come forward with any information until after he had read an extensive newspaper article detailing facts about the case. Counsel's strategy to impeach Kauffman's credibility through cross-examination was reasonable, and even assuming that additional impeachment by reputation would have provided further reason to disbelieve this one witness, Appellant has failed to show a reasonable probability that the result of the proceeding would have been different.

### VII. Failure to Investigate Appellant's Incompetency (Penalty Phase)

Appellant next claims that trial counsel were ineffective for failing to investigate, prepare and present evidence of Appellant's incompetency following the verdict, but prior to the court's colloquy conducted in order to determine whether Appellant's waiver of his rights to counsel and to present mitigating evidence during the penalty phase was knowing and voluntary. Essentially, Appellant claims that counsel was aware, or should have been aware, that Appellant was incompetent to waive those rights. Appellant goes so far as to claim that counsel's inaction amounted to an abdication of their role at a critical stage of the proceedings and represented the constructive denial of counsel. The PCRA court, which was the same as the trial court, found no evidence that Appellant was at any point incompetent and relied upon the extensive colloquy it undertook in order to ensure that Appellant validly waived his penalty phase counsel and mitigation rights; the court also noted counsel's testimony at PCRA proceedings that counsel believed Appellant was competent and, moreover, that counsel did, in fact, seek a continuance for further evaluation after the colloquy, out of an abundance of caution and a recognition of the gravity of the death penalty. PCRA Ct. Op., at 11-13.

The Commonwealth likewise notes that counsel requested a continuance following the waiver colloquy, specifically in order to have Appellant evaluated for the

purpose of determining his competence to make a knowing and voluntary waiver of his rights to counsel and to present evidence of mitigation, and that the request was denied by the court. The Commonwealth maintains that the only way Appellant can raise the instant claim is by alleging trial court error, a claim the Commonwealth contends has been waived by the failure to raise it on direct appeal. The Commonwealth further notes that Appellant presents no claim or analysis of his appellate counsel's performance. Appellant, in turn, maintains that the claim is viable as sounding in the performance of trial counsel because, he says, trial counsel should have asked the court to permit a competency evaluation before the court conducted its colloquy, and not after it, to determine whether Appellant's decision to forego the rights to counsel and to present mitigating evidence was knowing and voluntary.

Initially, we note that the record is clear, and the parties acknowledge, that Appellant was competent to stand trial. The record is further clear that Appellant maintained from the very first stages of the proceedings that, if the jury returned a verdict of guilty of first-degree murder, it was his intention to forego the presentation of any evidence of potential mitigation during the penalty phase. Following the verdict, Appellant requested that he be permitted to represent himself from that point forward, and informed the court that he did not intend to present any evidence of mitigating circumstances. The court conducted a thorough colloquy to explain to Appellant the potentially very damaging legal repercussions of such a decision and to determine whether Appellant's decision was knowing, intelligent and voluntary.

After the court conducted the colloquy, the following exchange occurred:

**MR. SPAHN** [penalty-phase counsel]: At this point, I would correct or clarify one thing which I believe I stated. I believe I stated that Mr. Davido was making a knowing decision. What I meant in that is there were no threats applied by me whatsoever to lead him to this decision, and this has been a position he stated from day one.

However, I am remiss if I don't ask the [c]ourt at this time for a continuance to have Mr. Davido evaluate[d.] Mr. Davido has been convicted of first[-]degree murder less than two hours ago. It is our position that he's not of a psychological state to absorb that and make a knowing, voluntary and intelligent decision with respect to this proceeding. So, at this point, I ask the [c]ourt to continue this matter and to [retain] a local psychiatrist to make such an evaluation.

**THE COURT**: Based on the comments that this has been his intent from the word go and my colloquy with him, or me, basically trying to talk him out of it at this point, although I don't think it is a good idea, it is his decision, and he certainly seems to be knowing and intelligent to me. So your motion is denied.

N.T. Trial, 12/12/01, at 1022-23.

Where there is reason to doubt a defendant's competency, the trial court is required to conduct a competency hearing. Commonwealth v. Uderra, 862 A.2d 74, 88 (Pa. 2004). Competency is measured according to whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings. Id. (citing Commonwealth v. Appel, 689 A.2d 891, 899 (Pa. 1997), and 50 P.S. § 7402).

Here, Appellant presents no meaningful argument to support his claim that if counsel's request for a competency evaluation been made prior to the colloquy, the request would have been granted by the court, or that the court erred in denying the request when it was lodged after the colloquy. Additionally, as the Commonwealth points out, Appellant's expert in forensic psychiatry, Dr. Robert Fox, testified at the PCRA hearing that he could not with certainty opine that Appellant was at any time not competent to decide to proceed without counsel and to forego the presentation of mitigating evidence during the penalty phase proceedings, in the event that he was

found guilty of first-degree murder. Because counsel did, in fact, request a continuance for a competency evaluation, and because Appellant has not shown a proper basis for any conclusion that the request was untimely, or that a doubt existed as to whether Appellant was competent when he acted in conformity with his long-stated intentions, the PCRA court did not err in denying this claim.

### VIII. Penalty Phase Waivers Were Not Knowing, Intelligent and Voluntary

Appellant next claims that his waivers of the right to counsel and to forego the presentation of evidence of mitigating factors were not knowing, intelligent and voluntary, and that "trial counsel ineffectively failed to protect Appellant from making invalid waivers." Appellant's Brief at 81. The gravamen of the claim is that the court's colloquy with respect to waiver was deficient. Appellant additionally alleges that counsel should have known that Appellant's mental and emotional disturbance prevented him from understanding the waiver proceedings, and thus counsel "abandoned his duty to insure that any waiver by Appellant was knowing, voluntary and intelligent." Appellant's Brief at 83-84.

The Commonwealth responds, *inter alia*, that the issue has been previously litigated on direct appeal, and thus, is not reviewable on collateral appeal. This Court agrees that the question regarding the voluntariness of Appellant's waivers was litigated on direct appeal, having determined, on direct appeal, that Appellant's waiver of his rights to counsel and to present evidence of mitigating circumstances during the penalty phase was knowing, intelligent and voluntary. Davido, 868 A.2d at 442-44. Appellant's derivative Sixth Amendment claim that counsel rendered ineffective assistance by failing to protect him from making invalid waivers, however, has not been previously litigated. See Commonwealth v. Hanible, 30 A.3d 426, 442 (Pa. 2011) (Sixth Amendment claim alleging ineffective assistance of counsel raises issue cognizable

under PCRA even if claim underlying ineffectiveness claim has been previously litigated) (citing Commonwealth v. Collins, 888 A.2d 564, 573 (Pa. 2005)).

On this issue, the PCRA court reiterated the extent of its colloquy at the trial and noted that, even though counsel did not think Appellant was incompetent given their interaction at trial, counsel acted reasonably in seeking further evaluation. PCRA Ct. Op., at 13-15. Because this Court has already held that that Appellant's waivers were knowing, intelligent, and voluntary, his current claim of ineffectiveness based on the alleged failure of counsel to protect him from making invalid waivers, though distinct for previous litigation purposes, necessarily fails on the merits. Thus, the PCRA court properly dismissed the claim. Commonwealth v. Rega, 933 A.2d 997, 1026-28 (Pa. 2007) (where waiver of right to present evidence regarding mitigating circumstances is knowing, intelligent, and voluntary, counsel cannot be deemed ineffective for abiding by restrictions imposed by client on mitigation presentation).

## IX. Failure to Investigate and Present Mitigating Evidence

Appellant next claims that, notwithstanding his waiver of his rights to counsel and to presentation of mitigation evidence during the penalty phase, trial counsel was ineffective in failing to investigate, discover, and present mitigating evidence to the jury. Specifically, Appellant claims that trial counsel should have presented substantial and readily available mitigating evidence regarding Appellant's cultural and mental health background, arguing that such evidence would have presented "a devastating portrait of Appellant's traumatic childhood, abandonment, familial instability and mental health deficits that profoundly affected Appellant's perceptions and relationships to the world around him." Appellant's Brief at 91. Appellant baldly maintains that "it is reasonably likely that, had counsel investigated properly and informed Appellant of the full breadth of available mitigating evidence, Appellant would not have waived his rights to counsel

and to present mitigating evidence." Id. at 90. As such, Appellant alleges that he was "prejudiced by [trial] counsel's deficient performance." Id.[15]

The PCRA court rejected this claim, again stressing Appellant's consistent "steadfast desire" against presenting mitigating evidence, and that trial counsel had, in fact, investigated and prepared mitigation evidence for presentation, which the court learned when it permitted Appellant to proceed pro se. PCRA Ct. Op., at 15-16. The record shows, as the court stated and the Commonwealth argues, that prior to waiving his rights to counsel and to the presentation of mitigating evidence, Appellant knew that penalty-phase counsel had been prepared to present a great deal of potential mitigating evidence aligned with the enumerated statutory mitigation factors. As the Commonwealth accurately notes, prior to the penalty phase, in open court with Appellant present, penalty phase counsel carefully outlined the substantial mitigation evidence he was prepared to present, and the court thoroughly explained to Appellant the extreme importance of presenting mitigating facts to the jury.[16]

---

[15] Notably, Appellant did not testify at the PCRA hearing, and thus provided no testimonial support for the notion that he would not have waived the right to a presentation in mitigation if he had been made aware by counsel of the full measure of mitigating evidence available.

[16] Counsel was prepared to present, *inter alia*, evidence to support the following potentially mitigating factors: 1) Appellant's lack of a significant criminal history; 2) Appellant's extreme mental and emotional disturbance; 3) Appellant's age; 4) Appellant's concern for his family; 5) Appellant's ability to remain an active member of his family if imprisoned for life; 6) Appellant's troubled background, which included emotional trauma in his childhood and formative years; 7) testimony from family members; 8) testimony from Appellant's pastor; 9) Lancaster County Children and Youth records; 10) Las Vegas Family and Youth Services records; 11) the nomadic lifestyle of Appellant's family; 12) Appellant's father's abuse of Appellant's mother; 13) Appellant's father's abuse of Appellant and his siblings; 14) Appellant's attempts to protect and shield his mother and siblings from his father's abuse; 15) Appellant's lack of a formal education; 16) Appellant's efforts to support his family through odd jobs after his father's death; 17) the psychological effect on Appellant of his father's death; and (…continued)

Nevertheless, Appellant now claims that certain mitigating cultural, social and mental health evidence was not fully investigated by counsel. The specific foundation of Appellant's current claim is that he and his family are members of, and adherents to Gypsy culture, and that an understanding of Gypsy customs and beliefs was "crucial in assessing Appellant's state of mind and behavior on the date of the offense." Appellant's Brief at 87. At the PCRA hearing, Appellant presented the testimony of anthropologist Dr. Anne Sutherland, who is an expert in Gypsy culture.[17] Nevertheless, Dr. Sutherland's testimony does not support Appellant's position that had Appellant known that counsel had investigated Gypsy culture and intended to present evidence

_____

(continued…)
18) testimony from a prison warden that Appellant had aided in preventing another prisoner from committing suicide. See N.T. Trial, 12/12/01, at 999-1006.

[17] Among other things, Dr. Sutherland identified Appellant as a Gypsy by birth and heritage. According to Dr. Sutherland, Gypsies are nomadic clans with a long history of persecution, which has made their culture very insular and distrustful of non-Gypsies. Specifically, she testified that Gypsies "have learned to be secretive and to avoid non-Gypsies as a way of survival." N.T. PCRA Hearing, 11/23/09, at 129. She testified that the clans are patriarchal, and that Appellant's grandfather had been the leader of the clan to which Appellant initially belonged. Appellant's father, as the eldest son of the clan leader, had been next in line to become clan leader. Appellant's father, however, had mental and behavioral problems which caused him to fall out of favor with the patriarch. The clan splintered, and Appellant's immediate family became a clan unto itself, led by Appellant's father. That clan was shunned by the members of the larger clan who suddenly moved to another state. This shunning reportedly had a profound emotional impact on Appellant, particularly because Appellant's father died soon after the schism erupted, and the mantle of clan leader fell upon Appellant, who was only fifteen at that time. This circumstance reportedly caused him much stress over the next ten years of his life, as his immediate clan remained shunned by the larger group and he had very little experience in the leadership skills necessary to keep his clan functioning as an organized unit. In addition, Dr. Sutherland testified that oral sex is a major taboo among members of the Gypsy culture, and that members of a clan may be shunned by other Gypsies for engaging in oral sex.

about it as part of a mitigation presentation, Appellant would have embraced his right to have counsel present the evidence instead of waiving it.

Moreover, counsel testified during the PCRA proceedings that he had, in fact, been aware of Appellant's association with Gypsy culture at the time of trial, and had identified several potential social history and anthropological experts, but ultimately determined that Appellant's association with Gypsy culture would not have been viewed as mitigating by a jury. Specifically, counsel testified that he believed testimony regarding Gypsy culture in general, and the specific influence of that culture on Appellant, would not have been well received by a Lancaster County jury. Additionally, counsel testified that his decision not to present such testimony was a strategic one:

> I was aware that the family on some level practiced Gypsy culture. I was aware on some level that this family moved around the country, to put it bluntly, between Lancaster, Las Vegas, Cleveland, and other areas. I was aware on some level the family believed that they were Gypsies, that there was some talk about the father being a Gypsy. I was aware that they would practice odd jobs. … I'm aware that they indicated to me that was somehow related to the Gypsy nature of employment. So there were certain specifics about the lifestyle I was aware of.
>
> ****
>
> I was aware of the Gypsy nature of his background. I did, in fact, toy with the idea of possibly consulting an expert in Gypsy culture. I compiled a list of potential psychological experts. I contacted Pennsylvania State University, Temple University, the surrounding universities. After having done that, I thought it through much more. We made a very strategic decision not to go down furthering any sort of Gypsy testimony.
>
> ****

> Basically, I had certain concerns about the Gypsy nature for mitigation evidence. The first concern I had, I was absolutely convinced, based on my experience, that a Lancaster County jury would not necessarily look favorably upon the Gypsy culture. I think that's a very difficult uphill battle locally.

N.T. PCRA Hearing, 6/25/09, at 420, 426.

Appellant has not shown that counsel's strategy in avoiding penalty phase presentation of evidence relating to Gypsy culture (assuming counsel had been permitted by Appellant to present mitigation evidence at all) was unreasonable. Moreover, as explained supra, the underlying claim has been previously litigated, and we have determined that counsel did not render ineffective assistance by allegedly failing to protect Appellant from waiving penalty phase rights. To the extent that the current claim of ineffectiveness is sufficiently distinct to warrant additional review, this Court has rejected similar claims on the merits. Thus, in Commonwealth v. Puksar, 951 A.2d 267 (Pa. 2008), the appellant had waived his right to present mitigating evidence at trial (but did not, as here, challenge the waiver on direct appeal), and then maintained on collateral appeal, *inter alia*, that had penalty counsel properly informed him of the nature of the mitigating evidence and its importance, he would have permitted its presentation. Id. at 289-92 (Pa. 2008). In addressing the issue in Puksar, the Court noted that the appellant had not testified at the PCRA hearing to substantiate the claim, and that, because the record showed that the appellant had steadfastly maintained his desire not to present mitigating evidence, and the waiver colloquy on its face appeared to be thorough, counsel's alleged failure to investigate mitigating evidence could not have been prejudicial, and that the appellant had simply failed to show that "the outcome of his waiver of mitigation would have been different but for counsel's inaction." Id. at 292.

Here, the record is clear that counsel prepared substantial mitigation evidence and that Appellant remained steadfast in his determination not to present mitigating evidence, despite counsel's preparation and the trial court's full explanation of the importance of a mitigation evidence presentation and the potentially dire consequences of the waiver. Further, the present claim sounds in the notion of what the effect would have been upon Appellant's decision, but Appellant did not testify at the PCRA hearing to substantiate the claim. Nor did Dr. Sutherland's testimony establish that, if counsel had advised Appellant that his cultural heritage might be a potentially mitigating circumstance, Appellant would have agreed to presentation of a case in mitigation. Because Appellant has failed to establish that he would have permitted social, cultural and mental health mitigating evidence to be presented if counsel had made him more fully aware of its existence and import, and because we have previously determined that Appellant's waiver of his right to present mitigating evidence was knowing, intelligent and voluntary, the PCRA court's denial of relief on this claim of counsel ineffectiveness was proper and supported by the record.

## X. Deprivation of Due Process in the PCRA Proceedings

Appellant claims that the PCRA court violated his right to due process and his right to the effective assistance of counsel in post-conviction proceedings, by: 1) precluding him from presenting expert rebuttal testimony; 2) striking the expert reports of Drs. Melham and Mangla; 3) denying him discovery of images used by the Commonwealth's expert, Dr. Ross, during his testimony, images not previously disclosed to the defense; and 4) allowing the Commonwealth to present expert testimony without prior notice and without providing the expert's report to the defense. Appellant's Brief at 92-93.

The factual basis for this claim is that after Drs. Wetli and Scotti had testified on Appellant's behalf at the PCRA hearing that the cause of the victim's death had likely been an aneurysm, the Commonwealth called Dr. Ross in rebuttal, and he testified that the cause of death had been blunt force trauma to the head that resulted in fatal bleeding and swelling in the brain, and that no aneurysm had been present. Dr. Ross, who, as explained, had performed the autopsy, prepared the post-mortem report, and testified at trial, prepared no additional report for purposes of PCRA review, but had been on the list of potential Commonwealth witnesses at the PCRA proceedings.[18] In his rebuttal testimony, Dr. Ross relied in part on CT scan images and cerebral flow studies reprinted from the victim's medical records. He testified that the images helped him confirm that no aneurysm had been present. The images and studies were not entered into evidence, but were marked for identification purposes. Appellant's counsel

---

[18] Appellant objected to Dr. Ross being permitted to testify on the basis of the lack of a proffer, the lack of an expert report, and because permitting his testimony would be unfair, and "the definition of ambush." N.T. PCRA Hearing, 6/26/09, at 654. The court asked the Commonwealth for a proffer, to which the assistant district attorney replied as follows:

> First, he did not prepare another report. Secondly, I also note that I verbally and in writing advised [counsel] that Dr. Ross may be one of the Commonwealth witnesses in this case. He's going to testify as [to] why he disagrees with the conclusions of Dr. Wetli and Dr. Scotti regarding the cause of death in this case, and he's going to explain his autopsy report and findings. He's going to be [testifying] about his procedures for looking for aneurysms and, basically, give more explanation as to why he disagrees with their conclusions based on what's contained in his report, his autopsy report.

Id. at 654-655. The court overruled Appellant's objection, but held a short recess to permit Appellant's counsel to speak with Dr. Ross prior to his testimony.

stated that he had no objection, and confirmed that he had copies of all CT scans and slides that had been used at trial.

At the conclusion of Dr. Ross's direct testimony, Appellant's counsel requested a continuance to review the CT scans, to consult with his experts, and to prepare rebuttal evidence prior to cross-examining Dr. Ross. The court denied the request, and after the conclusion of Dr. Ross's cross, re-direct, and re-cross examinations, the Commonwealth presented no further witnesses. Appellant's counsel then renewed his request for a continuance to present expert rebuttal testimony at a later date, stating that the expert would be Dr. Wetli. The court noted that "[w]e're getting into the duels of the battling experts" and a "he-said and she-said situation" that was of "limited value." N.T. PCRA Hearing, 6/26/09, at 699. Nevertheless, the court advised counsel to prepare and submit a report, and the court agreed to "make a determination if it's worthwhile bringing him [Dr. Wetli] back." Id. The court directed the Commonwealth to provide Appellant with copies of the exhibits it had marked for identification during the PCRA hearing, and the Commonwealth complied.

Appellant subsequently submitted three expert reports to the court to support his request to present expert rebuttal testimony.[19] Each report essentially stated that CT scans and cerebral flow studies have only limited application in ruling out aneurysms, and that, in any event, the images relied upon by Dr. Ross during his PCRA testimony did not rule out an aneurysm as the cause of the victim's death. None of Appellant's experts could state with certainty, however, that a ruptured aneurysm had been the source of the subarachnoid hemorrhage that had caused the victim's death. The court granted the Commonwealth's motions to strike the reports of Drs. Melham and

---

[19] Dr. Wetli, Dr. Elias R. Melham, and Dr. Sundeep Mangla each prepared an expert rebuttal report.

Mangla,[20] and declined to re-open the hearing for the purpose of permitting Dr. Wetli to testify in rebuttal, although Dr. Wetli's rebuttal report is part of the record. We address Appellant's claims in this regard as follows.

**a. Preclusion of expert testimony to rebut testimony of Dr. Ross**

Appellant argues that he should have been permitted to call Dr. Wetli to rebut Dr. Ross's testimony as to the victim's cause of death. "The appropriate scope of rebuttal has always been defined according to the evidence that it is offered to rebut." Commonwealth v. Hughes, 865 A.2d 761, 797 n.40 (Pa. 2004). "It is well settled that the admission or rejection of rebuttal evidence is within the sound discretion of the trial court." Commonwealth v. Bond, 985 A.2d 810, 829 (Pa. 2009). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion [that] overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Commonwealth v. Bryant, 67 A.3d 716, 726 (Pa. 2013) (quoting Commonwealth v. Eichinger, 915 A.2d 1122, 1140 (Pa. 2007)).

Here, the PCRA court precluded the proposed expert rebuttal testimony of Dr. Wetli on the basis that it would be merely cumulative of his previous testimony of record and, in large measure, simply a reiteration of conclusions and opinions that he had expressed during the hearing, such as: that a ruptured aneurysm was possibly the cause of the fatal hemorrhage the victim had suffered; that Dr. Ross had improperly ruled out a ruptured aneurysm as a possible cause; and that the constellation of injuries seen was not consistent with diffuse axonal injury. In the rebuttal report, Dr. Wetli opined, as he had at the hearing, in pertinent part, as follows:

---

[20] Thus, the reports of Drs. Melham and Mangla (copies of which are appended to Appellant's Brief) are not, as Appellant concedes, "part of the record available for appellate review." Appellant's Brief at 98.

> Clearly, Ms. Angelina Taylor died from a massive subarachnoid hemorrhage that occurred during or after a domestic altercation in which some blunt force trauma was inflicted. …The source of the subarachnoid hemorrhage is not known, and one is left to speculate.
>
> It is therefore my opinion to a reasonable degree of medical certainty that Ms. Angelina Taylor died from a massive subarachnoid hemorrhage of unknown etiology, and that there is absolutely no evidence for diffuse axonal injury.

Rebuttal Report of Charles V. Wetli, M.D., 9/4/09, at 4. Notably, according to the PCRA court, "even assuming there was an aneurysm that was brought about by [Appellant's] conduct . . ., the cause of death would be different than what Dr. Ross testified to, but as aptly stated by Dr. Wetli, the manner of death would be homicide. It is for this reason the [c]ourt felt that no further medical testimony would be necessary." PCRA Ct. Op., 12/29/11 (PCRA Ct. Op. 2"), at 19-20.

The court did not abuse its discretion in declining to re-open the PCRA hearing to permit the presentation of rebuttal testimony that was essentially cumulative and of limited value in determining the ultimate question of whether trial counsel had rendered ineffective assistance. Moreover, Appellant has shown no abuse of discretion with respect to the court's striking the rebuttal reports of Drs. Melham and Mangla as hearsay, because PCRA counsel clearly stated at the PCRA hearing that the proposed rebuttal expert would be Dr. Wetli. See PCRA Ct. Op. 2, at 20-21.

**b. Post-hearing evidentiary motion**

At the conclusion of the PCRA hearing, the court directed the Commonwealth to provide Appellant with copies of the CT scan images and flow studies that had been marked for identification and used by the Commonwealth during Dr. Ross's rebuttal testimony. Appellant concedes that in response to his correspondence asking for

copies of these images, "on or about July 31, 2009, undersigned counsel received a letter from the Commonwealth enclosing color copies of the[se] exhibits." Appellant's Brief at 94. In that letter, the Commonwealth reportedly advised that it had no original images, but that the original images could be obtained from Lancaster General Hospital. In November 2009, Appellant filed a Motion for Production of CT Scans and Flow Studies, seeking production of the CT scans and flow studies that had been marked for identification at the PCRA hearing. The motion asserted that Appellant had been unable to retrieve the original scans and films from Lancaster General Hospital because all originals had been signed out by the Hospital to the Lancaster County Coroner and had never been returned.

The court denied Appellant's motion on the basis that the exhibits marked for identification at the hearing (which were themselves copies of originals) had already been provided to Appellant, and thus "[t]here really seemed to be no basis for the Motion since [Appellant] had what [he] was asking for." PCRA Ct. Op. 2, at 21. Appellant has not cited any relevant authority to support his argument that "[t]he PCRA court erred in denying this discovery request[.]" Appellant's Brief at 98. Nor does Appellant set forth any argument as to why original images were necessary here or how the images provided did not fully satisfy his request for images. Moreover, each expert report submitted by Appellant (in support of re-opening the hearing for the presentation of rebuttal evidence) referenced the proposed expert's review of the images marked for identification at the hearing as the basis for the conclusions drawn.

The general rules for pre-trial discovery allow that "[w]hen there are items requested by one party which the other party has refused to disclose, the demanding party may make appropriate motion." Pa.R.Crim.P. 573(A). The procedural rules applicable to first capital PCRA petitions allow discovery more narrowly, i.e., only upon

good cause shown. Pa.R.Crim.P. 902(E)(2). Here, there was no refusal to disclose. Indeed, Appellant's Motion for Production of CT Scans and Flow Studies sought production of "copies" of the CT scans and flow studies marked for identification at the hearing, while acknowledging having already received "color copies of the[se] exhibits." Motion, 11/13/09, at ¶ 9 and p.4. The motion frivolously sought the production of material already in Appellant's possession; thus, we perceive no error in the court's denial of the motion on that basis.

### c. Permitting Dr. Ross to testify

Appellant characterizes the presentation of Dr. Ross's expert rebuttal testimony at the PCRA hearing as "trial by ambush" that was "fundamentally unfair" because it was a "surprise disclosure of prejudicial evidence," and thus, a violation of due process. Appellant's Brief at 95-96. Appellant argues that he was not first provided with a report detailing the substance of Dr. Ross's PCRA rebuttal testimony, and thus, he allegedly had no inkling as to what Dr. Ross might testify to, or even that Dr. Ross was a potential witness.

The Commonwealth responds that Dr. Ross had been on the list of potential PCRA witnesses and that his rebuttal testimony was based primarily on the findings contained in his original post-mortem report, a document of which Appellant was clearly aware.[21] Notably, the PCRA court described Appellant's objection to Dr. Ross's testimony and presentation of the issue on appeal as "disingenuous," in light of the fact

---

[21] Additionally, the Commonwealth asserts this sub-issue is waived because Appellant never made a motion pursuant to Pa.R.Crim.P. 573(B)(2)(b), which provides that if an expert for the Commonwealth has not prepared a report, "the court, upon motion, may order" the preparation and disclosure of a report.

that Appellant was in possession of the report as well as the transcripts of Dr. Ross's trial testimony. PCRA Opinion, dated 12/29/11, at 20.

This claim lacks merit. At the PCRA proceeding, Appellant clearly was in possession of the post-mortem report Dr. Ross prepared supplementary to the autopsy report, and knew very well that the essence of Dr. Ross's opinion was that that the fatal injury had been the result of blunt force trauma, and not a ruptured aneurysm. Appellant also was obviously aware that his PCRA experts had been critical of Dr. Ross's alleged conclusions regarding the victim's brain's Circle of Willis in his post-mortem report, and that Dr. Ross would certainly be called to rebut their opinions. Dr. Ross did so at the PCRA hearing, reviewing his post-mortem report statement that the Circle of Willis had been intact, and explaining that in order to have made this forensic observation, he would have had to dissect and examine that structure. On that basis, *inter alia*, Dr. Ross determined that no aneurysm had been present in the victim's brain, a determination contrary to the opinions of Drs. Scotti and Wetli, who testified that a ruptured aneurysm had been the likely cause of the fatal subarachnoid hemorrhage.[22]

Because Appellant knew Dr. Ross was a potential witness, and because Appellant had been in possession of Dr. Ross's post-mortem report and knew the substance of his opinion as to the victim's cause of death, Appellant's claim that Dr. Ross's PCRA testimony constituted unfair surprise or "trial by ambush" that violated his rights to due process is unavailing.

### XI. Cumulative Error

---

[22] As explained in Section III(d), <u>supra</u>, while Dr. Wetli testified that a ruptured aneurysm had likely been the cause of the fatal hemorrhage, Dr. Scotti testified that a ruptured aneurysm had undoubtedly been its cause. The court, however, determined that Dr. Scotti was not a credible witness.

Appellant next argues that the cumulative effect of the errors in his case entitles him to relief. While this Court has repeatedly emphasized that "no number of failed claims may collectively warrant relief i[f] they fail to do so individually," Commonwealth v. Sepulveda, 55 A.3d 1108, 1150 (Pa. 2012) (quoting Comonwealth v. Rainey, 928 A.2d 215, 245 (Pa. 2007)), we have also recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." Sepulveda at 1150 (quoting Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009)). Although we have adverted to the absence of prejudice in assessing a number of Appellant's Strickland claims, we are satisfied that even upon cumulation, no relief is due. Accordingly, Appellant is entitled to no relief on this claim.

## XII. Preservation of Prospective Future Claim

In the final appellate "issue" raised, Appellant's counsel, the FCDO, poses the following claim and argument, which we reproduce verbatim in its entirety:

> XII. THE DECEDENT HAD A PRE-EXISTING MEDICAL CONDITION THAT CONTRIBUTED TO HER DEATH; EVIDENCE CONFIRMING THE EXISTENCE OF THAT CONDITION HAS NOT BEEN LOCATED DESPITE COUNSEL'S EXERCISE OF DUE DILIGENCE AND/OR HAS BEEN WITHHELD BY THE PROSECUTION.
>
> As set forth above, we presented evidence from Drs. Scotti and Wetli that the likely cause of the decedent's death was the rupture of a berry aneurysm. We have not discovered evidence confirming that the decedent had symptoms of an aneurysm prior to the night in question, but we do not waive this claim, should such evidence surface or be disclosed in the future.

Appellant's Brief at 100. This does not state an issue requiring review, and we obviously make no comment upon whether the FCDO's statement is relevant to the preservation, or the merit of, any future such issue.

## XIII. Commonwealth's Post-Submission Application for Relief

On August 15, 2012, this Court ordered the FCDO to produce a copy of any federal appointment order it may have secured in this matter authorizing it to pursue a PCRA petition on Appellant's behalf in state court, citing 18 U.S.C. § 3599(a)(2) (authorizing appointment of counsel to indigent state defendants actively pursuing federal habeas corpus relief from death sentence).  The FCDO's response attached an order of former U.S. District Court Judge James T. Giles, dated March 7, 2006, appointing the FCDO to represent Appellant only in federal habeas corpus proceedings.

The Commonwealth thereafter filed an application seeking disqualification of the FCDO as counsel, and attached a copy of the federal habeas docket at the number above, which showed that the federal habeas matter had been marked "closed for statistical purposes" and placed in a "civil suspense" file in December 2008.  We are not an evidentiary court, and in similar circumstances, where the Commonwealth has sought the disqualification of the FCDO in capital state post-conviction appeals, we have remanded to the PCRA court for a determination of the propriety of FCDO involvement.  See, e.g., Commonwealth v. Mitchell, No. 617 CAP, 2013 Pa. LEXIS 74 (Pa., Jan. 10, 2013) (*per curiam* order).

While offering no view on the merits of the Commonwealth's concerns, in the interest of judicial economy, we deny the Commonwealth's Post-Submission Application for Relief, and simply file our determination affirming the denial of PCRA relief.

Affirmed.  Jurisdiction relinquished.

Mr. Justice Eakin did not participate in the consideration or decision of this case.

Mr. Chief Justice Castille and Messrs. Justice Baer and Stevens join the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Saylor files a concurring opinion.

Madame Justice Todd concurs in the result.