J-S18015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JOSHUA J. STOKES | |
| Appellant | No. 3094 EDA 2016 |

Appeal from the Judgment of Sentence December 11, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-0000720-2011

BEFORE:   PANELLA, J., SOLANO, J., and FITZGERALD, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED APRIL 24, 2017**

Appellant, Joshua J. Stokes, appeals from the judgment of sentence entered after a jury convicted him of, among others, first-degree murder. Appellant raises multiple challenges to his convictions, including claims that the trial court erred by incorrectly determining that he was competent to stand trial and unconstitutionally precluding him from attending most of the jury trial. We affirm.

The trial court summarized the relevant factual of the case history as follows.

> On the evening of August 29, 2010, the decedent, Stephanie Clory, Clory's companion, Fabian Hall, and Clory's daughter, Frankie Maria Batts, socialized at Hall's home. At approximately 11 p.m., Batts and Clory returned to their home at 54th Street

---

[*] Former Justice specially assigned to the Superior Court.

and Regent Street. Once inside, Clory asked Batts for money to purchase beer. Upon Batts' refusal, Clory told Batts that she was going to walk to [Appellant's] house to get money from him. Clory left her house around 11:20 p.m.

Clory walked about a block and a half to [Appellant's] house at 1229 S. Peach Street. Once inside the house, [Appellant] confronted Clory about her relationship with Hall, and accused her of using him (the [Appellant]). [Appellant] then grabbed an eight-inch chef's knife from the kitchen and stabbed Clory several times while in the front foyer. Clory attempted to escape by opening the front door, but [Appellant] stabbed her several more times. The stabbing sprayed Clory's blood prominently along the front door and foyer wall.

[Appellant] stabbed Clory so violently that he bent the knife's blade. He dropped the bent knife in the foyer, retrieved a second knife from the kitchen, returned to the foyer, and resumed stabbing her. The continued stabbing resulted in a pool of blood, which stained the soles of [Appellant's] white Reebok shoes. Before fleeing through the back door, [Appellant] threw the second knife in a kitchen wastebasket. In his haste, [Appellant] tracked bloody footprints from the foyer to the back door, and smeared the door handle with blood from his hands. As [Appellant] fled through the back door, he tracked blood through his back porch and fence.

***

According to Philadelphia Deputy Chief Medical Examiner, Dr. Albert Chu, an expert in forensic pathology, Clory sustained nineteen distinct stab wounds, including two wounds that punctured her right lung, one wound that penetrated [] her liver, and one wound that severed her trachea. The right-chest wounds caused severe internal and external bleedings and prevented Clory's right lung from exchanging oxygen. The wounds were insufficient to cause immediate loss of consciousness, but the combination of blood loss and Clory's inability to breathe resulted in her death. Dr. Chu concluded, to a reasonable degree of medical certainty, that the cause of her death was homicide by multiple stab wounds.

***

After [Appellant] fled 1229 S. Peach Street, he walked to 5655 Angora Terrace, where his mother, Eloise Lewis, lived. Lewis answered [Appellant's] knocks at 12:30 a.m. and invited [Appellant] in, whereupon [Appellant] transferred blood from his hands onto Lewis'[s] front door. Once inside, [Appellant] told Lewis that he had beat a girl in the face and head with a knife. [Appellant] told Lewis that he did it because the girl was seeing another person named "Fab" and that he hoped the girl died. Afterwards, [Appellant] washed his hands in Lewis'[s] kitchen and splattered the decedent's blood on the wall above the sink.

While investigating the murder, Detective Thomas Gaul conducted a record check, and discovered that [Appellant] owned 1229. S. Peach Street and listed 5655 Angora Terrace as an alternative address. The morning after the murder, between 5:30 a.m. and 6:00 a.m., Detective Gaul arrived at 5655 Angora Terrace, where he discovered blood on the front door. Lewis greeted Detective Gaul and gave him permission to search the home. Detective Gaul also observed bloodstains on the kitchen wall. While searching the basement, Detective Gaul discovered [Appellant] hiding behind boxes. Detective Gaul noticed blood on [Appellant's] shoes and seized them.

At 6:40 a.m., uniform officers transported [Appellant] to the Philadelphia Homicide Unit, while Detective Gaul remained at 5655 Angora Terrace to interview Lewis. Lewis told Detective Gaul that [Appellant] lived at 1229 S. Peach Street and repeated what [Appellant] had told her about beating a girl with a knife.

Later that morning, on August 30, 2010, Detective Gaul gave [Appellant] written *Miranda* warnings and interviewed him. During the interview, [Appellant] admitted that he killed Clory because he disapproved of her relationship with Hall and felt that she was using him. [Appellant] initialed each ***Miranda*** warning and question and signed the bottom of each page.

Trial Court Opinion, 2/26/16, at 2-5 (citations to the record omitted).

Appellant was arrested and charged with the murder of Clory and possession of an instrument of crime, 18 Pa.C.S.A. §§ 2501 and 907, respectively.

The trial court initially found Appellant incompetent to stand trial and committed him to Norristown State Hospital. After lengthy proceedings concerning Appellant's competence to stand trial, Appellant was found to have been malingering and declared competent.

Following jury selection, Appellant refused to return to the courtroom and the sheriffs were required to manually extract Appellant from the holding cell. Appellant informed the court that he did not wish to be present for his trial and threated to disrupt the proceedings. Following a verbal colloquy, the trial court granted Appellant his wish and allowed Appellant to remain in the holding cell for the majority of the trial.

Ultimately, on December 11, 2015, a jury convicted Appellant of first-degree murder and possession of an instrument of crime. This timely appeal follows.[1]

Appellant raises three issues on appeal. We first address his claim that the evidence was insufficient to sustain his conviction for possession of an instrument of a crime. **See** Appellant's Brief, at 4. Appellant has waived this issue. In order to preserve a sufficiency claim for appellate review, an appellant must identify the specific element or elements of the crime he

---

[1] Appellant's initial appeal was quashed by a panel of this Court due to the failure of the trial court to dispose of post-sentence motions prior to the filing of Appellant's appeal. **See Commonwealth v. Stokes**, 3094 EDA 2016 (Pa. Super., filed September 7, 2016) (unpublished memorandum). This appeal follows the trial court's denial of Appellant's post-sentence motions.

alleges was insufficiently supported at trial. ***See***, ***e.g.***, ***Commonwealth v. Williams***, 959 A.2d 1252, 1257-1258 (Pa. Super. 2008). Further, an appellant can waive a claim if he fails to adequately develop the issue in his appellate brief. ***See Commonwealth v. Delvalle***, 74 A.3d 1081, 1086-87 (Pa. Super. 2013). Appellant failed not only to specify an element for his sufficiency argument, but also completely and utterly fails to develop this issue in his appellate brief. ***See*** Appellant's Brief, at 4, 14. Thus, we find this issue waived.

Moving to the first of Appellant's issues preserved for our review, Appellant contends that the evidence was insufficient to sustain his conviction for first-degree murder. ***See*** Appellant's Brief, at 4, 14-24. Specifically, he asserts that there was insufficient evidence of an intentional, willful, deliberate, and premeditated killing to sustain this conviction. ***See id***., at 21. Instead, Appellant asserts that the evidence only supported a conviction for voluntary manslaughter. ***See id***., at 22-24.

Our standard of review is well-settled.

> The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weight the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilty may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined

circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Helsel*, 53 A.3d 906, 917-918 (Pa. Super. 2012) (citation omitted; brackets in original).

To sustain a conviction for first-degree murder, the Commonwealth must prove beyond a reasonable doubt that the defendant committed an "intentional killing." 18 Pa.C.S.A. § 2502(a). An intentional killing is defined as "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premediated killing." 18 Pa.C.S.A. § 2502(d). Further, our Supreme Court has held that, in order to support a conviction of first-degree murder, the Commonwealth must establish that: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill. *See Commonwealth v. Sanchez*, 82 A.3d 943, 967 (Pa. 2013). A jury may infer the specific intent to kill, as well as malice, based upon a defendant's use of a deadly weapon on "a vital part of the victim's body." *Commonwealth v. Houser*, 18 A.3d 1128, 1133-1134 (Pa. 2011) (citation omitted).

Here, it is undisputed that the victim was unlawfully killed and Appellant does not appear to contest that the Commonwealth provided

sufficient evidence to prove that he was responsible for the killing. As noted, Appellant challenges only the third element and avers that the Commonwealth's evidence does not establish specific intent to kill or malice and therefore only supports voluntary manslaughter. However, our review of the evidence establishes that the Commonwealth presented sufficient evidence—Appellant stabbed the victim *nineteen* times, puncturing her trachea, lung and liver. Further, when Appellant's first knife bent, he ceased his attack only long enough to retrieve another knife. This clearly supports the jury's inference that Appellant acted with malice and specific intent to kill. *See id*.

Further, contrary to his claim, the evidence does not support Appellant's assertion that the stabbing stemmed from an angry confrontation with Clory and therefore occurred in the heat of passion. At trial, Appellant testified that he had not spoken to Clory, and therefore had no problem with her, for months prior to her death. Although Lewis's statements to the police supports the inference that Appellant was upset due to Clory's relationship with Hall, there is no evidence that Clory provoked Appellant with this relationship on the night of her murder. *See Commonwealth v. Mason*, 130 A.3d 601, 630 (Pa. 2015) (holding evidence of previous issues between Appellant and victim insufficient to support heat of passion defense; Appellant must show "provocation on the part of the victim immediately prior to the attack). Accordingly, we agree with the trial court's

determination that there was sufficient evidence of malice and specific intent to kill to support a first-degree murder conviction.

Next, Appellant argues that the trial court erred by declaring him competent to stand trial. *See* Appellant's Brief, at 4, 25-31. Appellant points to his "testimony at the competency hearing and outrageous conduct/statements before and during trial and sentencing" to show that he was "clearly not competent to stand trial." *Id*., at 29. Under these circumstances, Appellant contends that the trial court erred in determining that Appellant was competent to stand trial. *See id*., at 25. Thus, Appellant contends he is entitled to a new trial. *See id*., at 31.

In reviewing Appellant's contention, we note the following standard.

> A defendant is presumed competent and it is his burden to show otherwise, the determination of which is within the sound discretion of the trial court. When a competency hearing takes place, incompetency may be established by a preponderance of the evidence. The sensitive nature of competency determination requires the appellate courts to afford great deference to the conclusions of the trial court, which has had the opportunity to observe the defendant personally. When the record supports the trial court's determination, we will not disturb it.

*Commonwealth v. Stevenson*, 64 A.3d 715, 720 (Pa. Super. 2013) (internal citations omitted). Further, our Supreme Court has stated that

> [w]here there is reason to doubt a defendant's competency, the trial court is required to conduct a competency hearing. Competency is measured according to whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings.

***Commonwealth v. Davido***, 106 A.3d 611, 639 (Pa. 2014) (*per curiam*)

(internal citations omitted).

The trial court explained its competency finding as follows.

> In January and February 2015, the Honorable Sheila Woods-Skipper held hearings to determine whether [Appellant] was competent to stand trial. At those hearings, Dr. Miles C. Landenheim – a board certified psychiatrist – stated that the [Appellant] was malingering and was "devoid of any appreciable psychiatric symptomatology that would otherwise impair him from being able to participate and assist in his defense." Dr. Landenhein based his finding on several factors, including examinations of [Appellant] as well as unsolicited conversations he had with prison personnel who informed Dr. Landenheim that [Appellant] acted in an appropriate manner and spoke lucidly with prison employees when the doctor was not present. He placed toothpaste on his face only when he was in court or when he saw a psychiatrist.

> Dr. Landenheim further found [Appellant] to have "above average intellectual capability" and that he was "able to assimilate information fairly easily and successfully." [Appellant] was able to clearly communicate subtle medical issues to the medical staff at the prison. Dr. Landenheim also reviewed investigative reports, where [Appellant] was able to make accusations against other prisoners. Further, prison call recordings between [Appellant] and his mother showed that [Appellant] was able to follow the "intricacies of how much money was being sent to him and the monetary value of the food that he was being sent." Dr. Landenheim found that [Appellant] better understood the money than his mother, who was handling the account. [Appellant] was also interested in watching television news programs.

> [Appellant], however, argues that Dr. Landenheim's conclusions were speculative. Although [Appellant] was not cooperative in Dr. Landenheim's examinations, Dr. Landenheim examined him on four occasions. Based on those examinations, Dr. Landenheim's concluded that if [Appellant] were cooperative, he "fully expect[ed] . . . that with a *reasonable degree of medical and psychiatric certainty*[,] that [Appellant] would have

demonstrated an adequate understanding of the legal proceedings."

Following the competency hearings, Judge Woods-Skipper found no psychiatric impairment that precluded [Appellant's] participation in a trial. Judge Woods-Skipper also made a factual finding that [Appellant] was malingering. This [trial court] finds no reason to disagree with Judge Woods-Skipper's findings. During the court of the trial before this [trial court, Appellant] did not exhibit any signs of a mental disorder; nor did he remotely appear that he was unable to participate and assist in his defense. [Appellant] took the stand twice before [the trial court]-for a motion hearing and in his own defense at trial. Both times [Appellant] gave prompt and coherent answers to counsels' questions. [Appellant] has failed to meet his burden and was thus competent to stand trial.

Trial Court Opinion, 2/26/16, at 10-11.

We have reviewed the record and find that the trial court did not abuse its discretion in concluding that Appellant was competent during his trial and sentencing. Because the record supports the trial court's conclusion, we will not disturb the trial court's exercise of its discretion. *See Stevenson*, 64 A.3d at 720. Thus, we find no merit to Appellant's second issue on appeal.

Finally, Appellant contends that he was denied a fair trial because he was absent from the courtroom for most of his trial. *See* Appellant's Brief, at 4, 32-38. Appellant contends that the mere fact that he was absent from trial, coupled with his incompetency, precluded a fair trial. *See id*., at 38. We disagree.

The Sixth Amendment to the United States Constitution protects a defendant's right to be present at his criminal trial. *See* U.S. Const. Amend. 6. *See also Taylor v. United States*, 414 U.S. 17, 20 (1973). Additionally,

- 10 -

in Pennsylvania, this right is protected by Article I, Section 9 of the Pennsylvania Constitution and by Pennsylvania Rule of Criminal Procedure 602(a). **See** Pa. Const, Art. 1 § 9.; Pa.R.Crim.P. 602(a). **See also Commonwealth v. Tizer**, 684 A.2d 597, 604 (Pa. Super. 1996). However, our courts have held that this is a right that may be waived either impliedly, due to a defendant's actions, or expressly. **See Commonwealth v. Vega**, 719 A.2d 227, 229-230 (Pa. 1998); **Commonwealth v. Sullens**, 619 A.2d 1349, 1351 (Pa. 1992).

In the event a defendant wishes to expressly waive his right to be present at his trial, our Supreme Court has held that a trial court must conduct a colloquy to ensure that the accused is aware of his constitutional right to be present and the risk he ensues by waiving them. **See Vega**, 719 at 230-231.

> Such an inquiry would necessarily include, at a minimum, a discussion of whether the defendant understands that if trial proceeds without his presence: (1) he would be unable to participate in the selection of the jury; (2) he waives his right to confront and cross-examine witnesses; (3) he will not be present to testify in his own defense; and (4) any claim challenging effective assistance of counsel will be severly limited since the defendant has chosen not to participate in his defense and will be unable to aid counsel during trial.

**Id**., at 231.

> When we as an appellate court review a challenge to the validity of a waiver of the right to be present at trial, we look to the record to determine whether all the necessary information concerning the nature of the right and the risk of not exercising that right was communicated to the appellant. If such information was communicated to the appellant the waiver will

not be disturbed. The focal point of this analysis is whether the [a]ppellant made an informed choice.

***Commonwealth v. Faulk***, 928 A.2d 1061, (Pa. Super. 2007) (internal quotations and citations omitted).

In the instant case, following jury selection, the following exchange occurred:

> THE COURT: Mr. Stokes, since we recessed, it's my understanding that you initially refused to come back into the courtroom. And you have indicated that you did not want to come back into the courtroom. After the sheriffs told me that, I instructed [defense counsel] to go into the booth and the sheriffs to put you in the booth so you can have a discussion about whether or not that was in your best interest, to absent yourself from the courtroom.
>
> [Defense counsel] has reported to me that he has had some discussions with you and I have asked the sheriffs to bring you back out. So I need to take a few minutes to explain to you so that you understand what will happen if you absent yourself from the courtroom.
>
> First of all, you have a constitutional right to be present during your trial. You can waive that right, in other words, you can give up your right to be present during trial. But there are certain risks that you are taking if you choose to absent yourself from this trial. I want to make sure you understand those because there is a danger and a disadvantage to you if you choose not to be present during your trial.
>
> Now, first of all, you picked your jury, that's done. The next step in the proceeding is for the Commonwealth to call witnesses. You are waiving your right to confront and cross-examine the witnesses. [Defense counsel] will do it for you, but he will have no opportunity to speak with you while the witnesses are there and ask any questions that you may want him to ask.
>
> Also, if you absent yourself from the courtroom, you will not be available to testify on your own behalf just like you

testified on the motion. And you will severely limit any claim that you might have to ineffective assistance of counsel if you're not present to inform counsel and give him the information that you think he needs to do a good job.

So do you have any questions about what rights you're giving up if you choose not to be present during your trial?

Notes of Testimony, 12/8/15, at 93-95.

Although Appellant initially indicated that he was confused, after the trial court explained the rights for a second time, Appellant confirmed that he understood the rights he wanted to waive. Following Appellant's decisions, the trial court obtained audio and video equipment to ensure that Appellant was able to monitor the trial. The trial court also offered Appellant multiple opportunities to return to trial, which Appellant refused.

Our review of the record clarifies that the trial court's colloquy closely tracks the language mandated by in *Vega*. The trial court ensured that Appellant understood his rights, and acted properly in allowing him to waive these rights. Further, the trial court ensured that Appellant had multiple opportunities to return to his trial and observe the trial from his holding cell. Appellant obviously *now* regrets that decision, but there is no evidence that his waiver *then* was anything other than knowing and voluntary. Appellant's final issue on appeal merits no relief.

Judgment of Sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/24/2017</u>